[No. S010334. July 14, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ROBERT SCOTT, Defendant and Appellant.

### COUNSEL

John W. Clark, under appointment by the Supreme Court, Mary E. Arand, Anne S. Parsons and Clark & Arand for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, John R. Gorey, Robert S. Henry, Arthur H. Auerbach and Karen Bissonnette, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

CHIN, J.—Defendant assaulted and raped Wanda Jensen in her home, then set her on fire. While she yet lived, he pleaded guilty to her rape and attempted murder. Later, she died of complications from her burns. A new information, as amended, charged defendant with her murder under the special circumstances of rape and burglary murder. Defendant waived a jury trial. After a guilt trial, the court found defendant guilty of first degree murder, found the special circumstance allegations true, and found that defendant intended to kill Jensen and used a deadly weapon. After a penalty

trial, the court returned a verdict of death. It denied defendant's automatic motion to modify the verdict and sentenced him to death. This appeal is automatic. We affirm.

## I. FACTS

### A. *Guilt Phase*

On April 22, 1986, Wanda Jensen lived in an apartment in Palmdale with her five-year-old daughter. Around 2 a.m. that morning, defendant entered Jensen's apartment with socks over his hands, placed a screwdriver against her side, said he wanted to have sex with her, and threatened harm to her daughter if she refused. He hit her with a baseball bat she kept in the bedroom for protection, raped her, then beat and choked her into unconsciousness on her bed. He set the bed on fire and left. Jensen's daughter, asleep in an adjoining bedroom, awakened when a smoke alarm sounded. She went to her mother's room, saw the fire, and pulled at her mother. Jensen, badly burned, picked up her daughter and carried her to the nearby apartment of a friend, who called for assistance.

Jensen had suffered burns over 35 percent of her body. A Los Angeles County deputy sheriff described her appearance at the hospital: "She was extremely burned. It appeared that her nightgown had caught on fire on the right side of her body, and the flames, the burning appeared to go from very, very bad on the right side across her front, lessening to the left side. Her hair was singed off. Her facial hair was burned off. Her nipples were bubbled. She lifted her arm up, and her skin hung off like rags." Although in pain, Jensen was able to tell investigators what had happened and describe her assailant. She told her friend that the assailant had said he was "Rerun's brother Tony." Jensen's vagina contained semen.

After waiving his rights, defendant confessed in two statements to separate investigators. His account of what occurred was generally consistent with Jensen's. He said he had used a pack of matches from his pocket to light the bed covers. When the first investigator asked him if he had set the fire "to get rid of the girl and to destroy the evidence," defendant "lowered his head and he said, 'Yes.'" At that point, defendant glared at the investigator and said "he was now Tony and that Tony had taken charge of James' body, and he said he had to destroy the girl because she was a shit bomb . . . ." Before the second confession, defendant signed the waiver card with the name, "Tony Adman." When questioned about the signature, he changed it to his true name. He told both investigators that he was "Tony" and that "James was a wimp."

Glenn Johnson, known as "Rerun," testified that shortly before the crime, defendant came to his home. He gave defendant some socks, and they "smoked some cocaine." Defendant "was getting high." Although he denied it at trial, Johnson said previously that defendant had asked him for a screwdriver and gloves, and that he gave defendant a screwdriver but had no gloves. Defendant told the police that, before the crime, he purchased some cocaine and "did a couple lines of coke."

Jensen died on February 25, 1987, of "acute pneumonia due to hypoxic encephalopathy which was a result of thermal burns." The pathologist testified that the burns caused her ultimate death.

Dr. Marvin Ginsburg testified for the defense that Jensen received negligent medical treatment and would not have died had the treatment been competent. Dr. Ginsburg focused largely on two cardiac arrests Jensen suffered on April 28, 1986, that contributed to her eventual death, and that he believed could have been avoided with competent treatment. In rebuttal, Dr. Bruce Zawacki testified for the prosecution that, whatever deficiencies there may have been in Jensen's medical treatment, the burns "set in motion a chain of events that ultimately led to this arrest, and without the burn, there would have been no arrest . . . ."

After hearing the guilt testimony, the court found that Jensen "would probably have survived . . . in the absence of what [it] would find to be ordinary medical negligence," but it did "not find that ordinary medical negligence to be a superseding cause in this case. It is a contributing cause to the death of Wanda Jensen and does not relieve [defendant] of responsibility for her death."

## B. *Penalty Phase*

The parties stipulated that defendant pleaded guilty in 1983 to assault with a deadly weapon and, on June 24, 1986, in a different case, pleaded guilty to rape with use of a knife and infliction of great bodily injury. The prosecution presented evidence of the circumstances of both crimes. In 1983, defendant assaulted Paula H. with a knife in her house and said he was going to rape and kill her. She grabbed the knife, and they struggled. She managed to escape only after defendant cut and bit her. On April 1, 1986, three weeks before the assault on Jensen, defendant assaulted Violet H. in her Palmdale home with a knife and his fists, raped her, and choked her into unconsciousness.

The defense presented some of Paula H.'s testimony at the 1983 preliminary hearing of that prosecution and a psychological evaluation of defendant prepared in conjunction with that prosecution.

## II. Discussion

### A. *Guilt Phase Issues*

#### 1. *Double Jeopardy*

Before Jensen died, the prosecution charged defendant with noncapital crimes arising from her assault. On June 24, 1986, pursuant to a negotiated plea, he pleaded guilty to raping and attempting to murder Jensen and to charges related to the crimes against Violet H. The court sentenced him to prison for 42 years for all the charges. When Jensen died several months later, defendant was charged with her murder. Defendant argues that the second prosecution violated his constitutional and statutory rights against double jeopardy. Because defendant did not enter a plea of once in jeopardy, the issue is "technically" not cognizable on appeal. (*People v. Marshall* (1996) 13 Cal.4th 799, 824, fn. 1 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; see *People v. Belcher* (1974) 11 Cal.3d 91, 96 [113 Cal.Rptr. 1, 520 P.2d 385].) However, because defendant contends his attorney was ineffective, we must consider whether the contention has merit. (*Marshall, supra,* at p. 824, fn. 1; *Belcher, supra,* at p. 96.) It does not.

Both the United States and California Constitutions provide that a person may not twice be placed in jeopardy for the same offense. (*Benton v. Maryland* (1969) 395 U.S. 784, 794 [89 S.Ct. 2056, 2062, 23 L.Ed.2d 707]; *People v. Saunders* (1993) 5 Cal.4th 580, 592-593 [20 Cal.Rptr.2d 638, 853 P.2d 1093].) The court's acceptance of a guilty plea is the equivalent of a conviction and bars a later prosecution for the same offense. (*People v. Bivens* (1991) 231 Cal.App.3d 653, 659 [282 Cal.Rptr. 438].) ▇ Defendant argues that the attempted murder charge to which he pleaded guilty and the later murder charge were the "same offence" under the prevailing test. (See *United States v. Dixon* (1993) 509 U.S. 688, 696-697 [113 S.Ct. 2849, 2855-2857, 125 L.Ed.2d 556].) However, even if that argument is correct, an exception to traditional double jeopardy analysis applies when, as here, the prosecution is unable to proceed on the more serious charge at the outset because a fact necessary to sustain that charge—here the victim's death— had not yet occurred. Defendant could not be placed in jeopardy for the murder charge until the victim died.

In *Diaz v. United States* (1912) 223 U.S. 442 [32 S.Ct. 250, 56 L.Ed. 500], the defendant was charged with assault and battery, tried, and found guilty. When the victim later died, the prosecutor brought a homicide charge against the defendant. The United States Supreme Court affirmed a conviction for that charge. "The death of the injured person was the principal element of

the homicide, but was no part of the assault and battery. At the time of the trial for the latter the death had not ensued, and not until it did ensue was the homicide committed. *Then, and not before, was it possible to put the accused in jeopardy for that offense.*" (*Id.* at p. 449 [32 S.Ct. at p. 251], italics added.)

The high court has since repeatedly recognized that, "when application of our traditional double jeopardy analysis would bar a subsequent prosecution, '[a]n exception may exist where the State is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or have not been discovered despite the exercise of due diligence. See *Diaz* v. *United States*[, *supra*, 223 U.S. at pp. 448-449 (32 S.Ct. at p. 251)]; *Ashe* v. *Swenson* [(1970) 397 U.S. 436, 453, fn. 7 (90 S.Ct. 1189, 1194, 25 L.Ed.2d 469)] (conc. opn. of Brennan, J.)].'" (*Grady* v. *Corbin* (1990) 495 U.S. 508, 516, fn. 7 [110 S.Ct. 2084, 2091, 109 L.Ed.2d 548], overruled on other grounds in *United States* v. *Dixon, supra*, 509 U.S. at p. 712 [113 S.Ct. at p. 2864], quoting *Brown* v. *Ohio* (1977) 432 U.S. 161, 169, fn. 7 [97 S.Ct. 2221, 2227, 53 L.Ed.2d 187]; see also *Jeffers* v. *United States* (1977) 432 U.S. 137, 151 [97 S.Ct. 2207, 2216, 53 L.Ed.2d 168] (plur. opn. of Blackmun, J.) ["One commonly recognized exception is when all the events necessary to the greater crime have not taken place at the time the prosecution for the lesser is begun."].) California decisions have long recognized this exception under comparable facts (*People* v. *Wilson* (1924) 193 Cal. 512, 515 [226 P. 5]; *People* v. *Bivens, supra*, 231 Cal.App.3d at pp. 661-664; *In re Saul S.* (1985) 167 Cal.App.3d 1061, 1068 [213 Cal.Rptr. 541]), as have decisions from other jurisdictions (e.g., *People* v. *Carrillo* (1995) 164 Ill.2d 144 [207 Ill.Dec. 646, 646 N.E.2d 582, 584-585]; *People* v. *Harding* (1993) 443 Mich. 693, 699-705 [506 N.W.2d 482, 485-488]).

Penal Code section 654 provides that when "[a]n act or omission . . . is made punishable in different ways by different provisions of this code, . . . an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other." Defendant argues that this provision prohibits the subsequent murder prosecution even if the constitutional bar against double jeopardy does not. The same exception, however, applies to the statutory provision as to the constitutional one. (*People* v. *Bivens, supra*, 231 Cal.App.3d at pp. 663-664.) Defendant also argues that he could not be prosecuted under the felony-murder rule or for the rape-murder special circumstance because he had already been placed in jeopardy for the underlying rape. Again, the same rationale applies. Defendant was not and could not have been reprosecuted for rape, but, until the victim died, he also could not be prosecuted for murder under *any theory*. Therefore, until the victim's death, defendant was not placed in jeopardy for murder under any theory.

Defendant also argues that, at the time he pleaded guilty to attempted murder, the prosecution knew or should have known that the victim's death was inevitable. If this be so, it is irrelevant. (*People* v. *Bivens*, *supra*, 231 Cal.App.3d at p. 662, fn. 7; *In re Saul S.*, *supra*, 167 Cal.App.3d at p. 1067.) What is pertinent is that the fact necessary to the murder charge—the victim's death—had not yet occurred, not that it might, or even inevitably would, occur sometime in the future. A person cannot be prosecuted, and hence cannot be placed in jeopardy, for a crime not yet complete no matter how likely its future completion might be. Defendant finally argues that because he pleaded guilty to and received a substantial prison sentence for the crimes against Violet H., the prosecution did not need to press the charges involving Jensen immediately to prevent his release before she died. This circumstance makes no difference. The rule that a person may be prosecuted for murder after the victim's death despite an earlier prosecution for related crimes applies to all persons, including those who, like defendant, commit additional, unrelated crimes.

The prosecution had no duty to wait until the victim died before charging defendant with crimes already completed. It was entitled to charge defendant with rape and attempted murder at the outset rather than await the possible, or even inevitable, death of the victim, then bring the more serious murder charge when the victim died. In short, defendant has no right to benefit "merely because his victim proved to be a reluctant corpse . . . ." (*State* v. *Brusseau* (1975) 96 Idaho 558, 561 [532 P.2d 563, 566].)

### 2. *Adequacy of the Appellate Record*

■ Defendant contends the appellate record is inadequate because the court held unreported proceedings. Although Penal Code section 190.9, subdivision (a), provides that all judicial "proceedings" in capital cases "shall" be reported, defendant has shown no prejudice. He has the burden of showing that the appellate record is not adequate to permit meaningful appellate review. (*People* v. *Arias* (1996) 13 Cal.4th 92, 158 [51 Cal.Rptr.2d 770, 913 P.2d 980].) He has not met that burden.

About four months before trial, when defendant waived his right to a jury trial, the question arose whether he would plead not guilty by reason of insanity and, if so, whether the jury waiver would cover that issue. During the discussion, defense counsel stated, "I think the court, perhaps more so than most cases of this nature, is more critically aware of where the defense is headed at this time due to discussions that we have had in the presence of the district attorney as well. At this time I can honestly indicate a [not guilty by reason of insanity plea] is not contemplated." He also stated, "As the

court is aware, [defendant] sits before the court essentially sentenced on the offense, having entered into a plea disposition which committed him to 42 years. The People have that as a safety net. No matter what happens in this case, [defendant] is still under that sentence."

Defendant infers from his attorney's statements that there must have been previous unreported proceedings during which (1) the court was apprised that he had pleaded guilty to rape and attempted murder before Jensen died, and (2) the court and parties discussed defense strategy. As to the first point, the record fully establishes that the court knew of defendant's prior guilty plea and the sentence he received. Defendant can and does fully litigate any issue this circumstance presents. (See *post*, pts. II.A.6., 7.)

As to the second point, a hearing was held at defendant's request to settle the record. In reference to an early indication in the record that the court and parties had discussed scheduling in chambers and agreed on pretrial and trial dates (which agreement was then placed on the record), the court acknowledged there had been some early unreported discussions. But the discussions were not substantive. When settling the record regarding defense counsel's statement that the court was "aware of where the defense is headed," neither the prosecutor, defense counsel, nor the court could recall any unreported discussions concerning the defense that involved the court except possibly the question whether defendant would plead not guilty by reason of insanity. Defense counsel said that his statement "may simply be a product of an overly broad statement by me" when he was discussing the possibility of an insanity plea.

Other than defense counsel's vague reference during defendant's jury waiver four months before trial, which counsel clarified at the record settlement hearing, the record contains nothing suggesting unreported proceedings in which defense strategy was discussed. There is an indication that the *attorneys* discussed the case between themselves, at least one time "at lunch," but such discussions are not judicial "proceedings" within the meaning of Penal Code section 190.9. We find no reason to believe the court was told more about defense strategy than the record indicates. (*People* v. *Hawthorne* (1992) 4 Cal.4th 43, 64 [14 Cal.Rptr.2d 133, 841 P.2d 118].) "Defendant's ability to fully litigate any issue on appeal has thus not been compromised by the unreported conferences." (*People* v. *Freeman* (1994) 8 Cal.4th 450, 510 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].)

### 3. *Defendant's Absence From Proceedings*

■ Criminal defendants have the right to be personally present during all proceedings that bear a reasonable, substantial relation to their opportunity to defend against the charges. (*People* v. *Horton* (1995) 11 Cal.4th 1068,

1120-1121 [47 Cal.Rptr.2d 516, 906 P.2d 478].) Defendant contends this right was violated in two respects, both involving events long before trial.

First, on May 16 and 17, 1988, shortly after the preliminary hearing and almost a year before trial, a hearing was held in defendant's absence, but with defense counsel present, before the eventual trial judge on whether witness Glenn Johnson should be held in custody or ordered to post security to ensure his appearance at trial. (See Pen. Code, § 1332.) The attorneys for both sides expressed concern that Johnson might not appear. While urging the judge to take action, the prosecutor made several statements questioning both Johnson's willingness to testify and his credibility. The prosecutor quoted Johnson as telling a police officer and others he would not testify. The prosecutor said that, in his opinion, Johnson "did not cooperate in good faith and did not testify in a candid or truthful manner" at the preliminary hearing. The prosecutor also said Johnson was a friend of defendant's, and "they did coke together according to Mr. Johnson's admissions." Johnson told the court he would appear to testify. Ultimately, the court released Johnson "on his own recognizance and promise to appear." Johnson did testify at trial.

Defendant's absence at this hearing did not compromise his opportunity to defend against the charges. Although, as he now argues, the prosecutor made unsworn statements regarding the witness, and the court spoke with the witness, all discussion was in the context of determining what steps were appropriate to ensure Johnson's appearance as a witness at trial. The court was not asked to judge Johnson's credibility as a witness, but only the risk that he would not appear. Defendant was represented by counsel at the hearing. When Johnson did testify nearly a year later, in defendant's presence, defendant had the full opportunity to cross-examine and otherwise defend against the charges. We find no error in defendant's absence at this early hearing.

Defendant also argues his absence from the "unreported proceedings" (discussed *ante*, pt. II.A.2.) violated his right to be present. Again, we find no error. It is not clear defendant was absent from any such proceedings, but even if we assume he was, as discussed above, they were not significant. In defendant's presence, defense counsel informed the court that defendant had already been sentenced pursuant to a negotiated plea, so any previous mention of that plea in his absence did not substantially affect his opportunity to defend against the charges.

### 4. *The Judge's Failure to Disqualify Herself Sua Sponte*

Defendant argues that the earlier proceedings made it impossible for the judge to remain impartial during the court trial, and she should have disqualified herself sua sponte. We disagree.

At hearings months before trial, the judge heard various statements regarding witness Johnson and was informed that defendant had pleaded guilty to and been sentenced for related noncapital charges, and defense counsel gave the judge information about whether defendant would plead not guilty by reason of insanity. We doubt whether these facts alone would require the judge to disqualify herself had any party requested she do so. Although a defendant in a criminal proceeding, indeed a party in any proceeding, "is entitled to a trial by a judge who is detached, fair and impartial" (*In re Richard W.* (1979) 91 Cal.App.3d 960, 967 [155 Cal.Rptr. 11]), the mere fact a judge obtains information during litigation does not automatically disqualify that judge from further proceedings. "A trial judge hears many items during the course of a trial which are inadmissible, and [s]he is called upon to rule on the admissibility of numerous evidentiary matters. The fact that [s]he has heard these things does not mean that [s]he cannot divorce them from [her] mind." (*People* v. *Beaumaster* (1971) 17 Cal.App.3d 996, 1009 [95 Cal.Rptr. 360], quoted in *In re Richard W., supra,* 91 Cal.App.3d at p. 968 [both cases involving a court trial].) The information the judge received here was relatively insignificant and given for purposes other than to establish guilt or innocence. The record does not suggest the judge based her ultimate verdicts on anything but the evidence properly presented at trial. (*In re Richard W., supra,* 91 Cal.App.3d at p. 968.)

We need not decide definitively whether the judge should have disqualified herself on request, for the defense made no request. Defense counsel knew all the facts defendant now cites, and he did not ask the judge to disqualify herself. Therefore, defendant may not raise the issue for the first time on appeal. "If a judge discovers that [s]he cannot avoid consideration of information from another proceeding, or from a hearsay or other source, the preservation of the proper image of justice requires the judge to either recuse [her]self from conducting the trial *or reveal the particular information to the parties* so that the person who is possibly affected may either object to the court's consideration of the case, waive possible grounds for disqualification, or otherwise lay aside the issue." (*In re Richard W., supra,* 91 Cal.App.3d at p. 967, italics added.)

 Here, the judge did exactly what was required. The defense was fully aware of the facts because they were revealed either by or in front of defense counsel long before trial. The judge did not have to disclose further what the parties already knew. On another occasion, at trial, the judge did reveal information relevant to her impartiality that the parties might not otherwise have known. Before Dr. Ginsburg testified as a defense expert, the judge informed the parties that, years previously, her husband had rented

office space from the witness. Neither party expressed concern that this fact would affect the judge's consideration of the case.

If a judge refuses or fails to disqualify herself, a party may seek the judge's disqualification. The party must do so, however, "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification." (Code Civ. Proc., § 170.3, subd. (c)(1).) Here, defendant knew all the facts he now cites by the time he waived a jury, about four months before the trial. Yet he *never* objected to the judge's presiding over the trial or otherwise sought her disqualification. It is too late to raise the issue for the first time on appeal. (*Caminetti* v. *Pac. Mutual L. Ins. Co.* (1943) 22 Cal.2d 386, 392 [139 P.2d 930] [" 'It would seem . . . intolerable to permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware and thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not.' "]; *In re Steven O.* (1991) 229 Cal.App.3d 46, 53-55 [279 Cal.Rptr. 868]; *People* v. *Bryant* (1987) 190 Cal.App.3d 1569, 1572-1574 [236 Cal.Rptr. 96]; *In re Christian J.* (1984) 155 Cal.App.3d 276, 278-279 [202 Cal.Rptr. 54]; *In re Richard W.*, *supra*, 91 Cal.App.3d at pp. 967-968; *People* v. *Beaumaster*, *supra*, 17 Cal.App.3d at p. 1009.)

Defendant argues he did not waive his objection to the judge because he was not personally present at the hearing regarding witness Johnson. His absence makes no difference. He was represented by counsel, who *was* present at the hearing. ■ " 'When the accused exercises his constitutional right to representation by professional counsel, it is counsel, not defendant, who is in charge of the case. By choosing professional representation, the accused surrenders all but a handful of "fundamental" personal rights to *counsel's* complete control of defense strategies and tactics.' " (*In re Horton* (1991) 54 Cal.3d 82, 95 [284 Cal.Rptr. 305, 813 P.2d 1335], original italics [holding that counsel may impliedly stipulate to trial before a court commissioner].) " 'An attorney may not sit back, fully participate in a trial and then claim that the court was without jurisdiction on receiving a result unfavorable to him.' " (*Id.* at p. 91.)

### 5. *Validity of the Jury Waiver*

Defendant contends that his jury waiver was invalid. We disagree.

#### a. *The Facts*

The court accepted the waiver a few months before trial actually began. During the waiver proceeding, the prosecutor stated to defendant his understanding that "it is your intention to waive the right to have a jury in this

matter as to all phases of this case and proceed with the understanding that Judge Grignon, this department, would hear the case sitting alone as to all aspects." Defendant agreed that that was his intention. The prosecutor explained what a jury trial was and that the jury would have to agree unanimously on guilt, special circumstances, and penalty. He explained the charges, including the special circumstance allegations, and their significance, and that, if defendant waived a jury trial, the judge alone could find defendant guilty, find the special circumstances true, and impose the death penalty, with no need for anyone else to agree. He also explained the nature of a penalty trial. Defendant repeatedly said he understood.

Defendant stated that no one had made any threats or promises to induce him to waive a jury. One time defendant requested and was given an opportunity to consult with his attorney. He then said he was waiving a jury as to all phases "freely and voluntarily" because he "consider[ed] it to be the best available strategy and in [his] own best interests." Defense counsel stated that he and defendant had discussed the matter, and both agreed that the waiver was in defendant's best interests "in terms of trial tactics." Defendant personally stated he agreed. When the court noted that defendant had hesitated slightly at one point, defendant reiterated his desire to waive a jury. He said he had had enough time to talk to his attorney and felt comfortable with his decision.

The court accepted defendant's jury waiver, finding that he knowingly and voluntarily waived a jury as to guilt, special circumstances, and penalty. Defense counsel and the prosecutor joined in the waiver. The prosecutor clarified one point about the nature of the penalty phase, and both defendant and defense counsel reiterated that defendant still wished to enter the waiver.

The case was called for trial in April 1989. The court stated it had reviewed a transcript of defendant's jury waiver and wanted to discuss it further. The court explained that if, after a jury trial, the jurors returned a verdict of death, the court could still independently decide that death was not appropriate and impose a life sentence, but that with a court trial "there won't be any different person deciding that issue for the second time." Defendant indicated he understood and still desired to waive a jury "with respect to the penalty portion of the case." Defense counsel again joined. The court also explained that it would apply the same standards and law that the jury would have applied. Defendant indicated no one had suggested anything different.

b. *Discussion*

"A jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel." (Cal.

Const., art. I, § 16; see *People* v. *Ernst* (1994) 8 Cal.4th 441, 445 [34 Cal.Rptr.2d 238, 881 P.2d 298].) ▇ Here defendant and defense counsel expressly, knowingly, and voluntarily waived a jury trial as to all phases, and both parties consented. That being the case, the court was required to accept the waiver. (*People* v. *Terry* (1970) 2 Cal.3d 362, 378 [85 Cal.Rptr. 409, 466 P.2d 961] ["The judge does not have to give his consent to a nonjury trial, nor can he overrule the consent of the defendant and prosecutor."].)

Defendant claims, "Nothing in the record indicates that [he] was aware he could contest all elements of the capital charges, including intent to murder, despite his prior entry of the guilty plea to rape and attempted murder," and that "the record does not even show that [he] was aware his pleas had been disclosed before he gave up his jury trial right . . . ." However, nothing suggested he was *not* aware that he could contest all elements of the charge. He waived a *jury* trial, not a trial at all. He did receive a contested trial. Moreover, the prosecutor explained to defendant that, even in a court trial, he would have the right to confront and cross-examine witnesses and to testify on his own behalf. The court's awareness of defendant's plea to the noncapital charges was not relevant to the validity of his jury waiver. In addition, defendant heard his attorney inform the court of the plea and gave no hint he wanted to change his mind despite ample opportunity to do so.

Defendant also argues that he hesitated whether to waive a jury. The court gave defendant all the opportunity he desired to consult with his attorney. After this consultation, he waived a jury without hesitation. Defendant also argues that he neither agreed nor was aware that his guilty plea to the noncapital crimes would be used against him in the capital case. However, as explained (*post*, pt. II.A.6.), that plea was not used against him. Defendant claims he "never affirmatively stated that he desired to waive [a] jury . . . ." The record shows otherwise. He also argues he did not "personally offer any reasons for such a decision but his counsel made clear his own opinion that a jury waiver was 'tactically . . . the best thing to do.'" "The law, however, does not impose on the trial court an obligation to explore a defendant's reasons for giving up the right to a jury." (*People* v. *Diaz* (1992) 3 Cal.4th 495, 571 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) That the defendant discussed the decision with counsel and relied on counsel's advice strengthens, not weakens, the waiver's validity. (*Ibid.*)

The advisement in this case was more detailed than the required minimum. (*People* v. *Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020] ["There is no constitutional requirement that appellant understand 'all the ins and outs' of a jury trial in order to waive his right to

one."]; *People* v. *Robertson* (1989) 48 Cal.3d 18, 38 [255 Cal.Rptr. 631, 767 P.2d 1109] [court need not "inform [defendant] that it would automatically review any verdict of death returned by a jury"].) The record shows that defendant understood he had a right to a jury trial as to guilt, special circumstances, and penalty, and that he voluntarily and knowingly waived that right as to each. The court properly accepted that waiver. (*People* v. *Diaz, supra*, 3 Cal.4th at p. 571.)

### 6. Issues Regarding the Trial

■ Defendant argues that his guilty plea to Jensen's rape and attempted murder, entered before she died, effectively admitted all the elements of the capital offense except causation, including, particularly, intent to kill, and that the plea was "improperly used against him without admonishment or waiver." His argument fails factually. Although defense counsel ensured that the court was aware of his prior plea, it was not used against him in this case.

Several months before Jensen died, defendant pleaded guilty before a different judge to Jensen's rape and attempted murder and to charges related to the crimes against Violet H. in return for the dismissal of other charges and a promised maximum prison sentence of 42 years. As noted previously, at the hearing in which defendant waived a jury trial, defense counsel stated, "As the court is aware, [defendant] sits before the court essentially sentenced on the offense, having entered into a plea disposition which committed him to 42 years. The People have that as a safety net. No matter what happens in this case, [defendant] is still under that sentence."

At trial, the court expressly stated that intent to kill was an issue. In defense counsel's guilt phase opening statement, given after the prosecution presented its case-in-chief, he stated, "it's the defense's position in this case that . . . [defendant] was committed to a sentence of 42 years in state prison, representing an aggregate number of charges in this case, and it is our position that that was the appropriate measure for a sentence, given the circumstances and given what I hope will develop in the course of the defense testimony." The prosecutor objected: "I have avoided his prior convictions because by agreement they are not admissible in part [*sic*] of the trial, and they either are or aren't. [¶] If we are going to talk about his prior pleas, it includes attempt[ed] murder, which would be relevant to certain intent and attitude issues in this case, and if we are going to by prior stipulation not make those part of the trial, then it has to be a two-way street." Defense counsel responded, "I think it's very apparent, inasmuch as we are not before a jury, this court is aware of [defendant's] stature before this court. In any event, I can go on without it."

Defendant then presented his evidence, and the parties argued the case. Discussing only the evidence presented at trial, both sides addressed at length the question whether defendant intended to kill. The court gave detailed reasons for its verdict. Based solely on the evidence presented at trial, it found defendant intended to kill. The court expressly stated its "understanding of the plea agreement was that those pleas could not be used in any subsequent murder trial."

From this record, it is clear that, although defense counsel used the prior plea and sentence to try to convince the court that defendant had already been sufficiently punished, that plea was not used *against* him in any way. The court understood fully that the plea was a negotiated disposition of noncapital charges that was not to be used in considering the murder charge. The court based its verdict, including the finding of intent to kill, solely on the evidence at the contested trial. That being the case, we need not consider defendant's arguments that use of the plea against him would have been improper. For the same reason, we disagree with defendant's related contention, which essentially repeats his argument that the court should have disqualified itself sua sponte, that he "was denied his right to an impartial trier of fact." We see no reason to question the court's impartiality.

 Defendant also argues he "was denied a fair trial because he was forced to appear in jail clothing . . . ." The record reflects that defendant often, perhaps always, appeared in court wearing jail clothing. It does not, however, show that defendant was *forced* to wear jail clothing. Defendant never objected or, so far as the record shows, sought to wear different clothing. He may therefore not complain on appeal. (*Estelle* v. *Williams* (1976) 425 U.S. 501, 508-509 [96 S.Ct. 1691, 1695, 48 L.Ed.2d 126]; *People* v. *Taylor* (1982) 31 Cal.3d 488, 495-496 [183 Cal.Rptr. 64, 645 P.2d 115]; *People* v. *Williams* (1991) 228 Cal.App.3d 146, 150-151 [278 Cal.Rptr. 801].)

### 7. *Claims of Ineffective Assistance of Counsel*

 Defendant argues his attorney was ineffective in many ways. Some of his claims relate to issues considered previously. To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant. (*In re Wilson* (1992) 3 Cal.4th 945, 950 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) "A reasonable probability is a probability sufficient to undermine confidence in

the outcome." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 2068, 80 L.Ed.2d 674].) "In determining whether counsel's performance was deficient, a court must in general exercise deferential scrutiny . . ." and must "view and assess the reasonableness of counsel's acts or omissions . . . under the circumstances as they stood at the time that counsel acted or failed to act." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839].) Although deference is not abdication (*id.* at p. 217), courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight. (*People* v. *Kelly* (1992) 1 Cal.4th 495, 522-523 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

■■■■ Counsel represented defendant first when he was charged with the noncapital crimes before the victim died and then when he was charged with capital murder. While judging counsel's performance, we must keep in mind the circumstances he faced, and particularly the fact that his client had already confessed fully to a hideous crime. (*People* v. *Williams* (1988) 44 Cal.3d 883, 922 [245 Cal.Rptr. 336, 751 P.2d 395].) These circumstances did not bode well for a successful defense and may have justified tactical decisions that might seem unreasonable under other circumstances. It is also particularly difficult to establish ineffective assistance of counsel on direct appeal, where we are limited to evaluating the appellate record. If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation. (*People* v. *Mendoza Tello* (1997) 15 Cal.4th 264, 266 [62 Cal.Rptr.2d 437, 933 P.2d 1134]; *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) With these principles in mind, we consider defendant's arguments in chronological order.

Defendant argues counsel should have raised a double jeopardy challenge to the capital charges. As discussed (*ante*, pt. II.A.1.), however, his double jeopardy claim lacks merit. Defendant also argues counsel was ineffective in advising defendant to plead guilty to the noncapital charges and then allowing that plea to be used against him in the capital trial. However, as discussed (*ante*, pt. II.A.6.), the plea was not used against him.

Defendant argues counsel should not have informed the court of the prior plea, especially since the parties had agreed it could not be used against defendant at the capital trial. The record suggests, however, a tactical reason for counsel's actions. A consistent theme of the defense was that defendant had pleaded guilty promptly to serious crimes before Jensen died and had received a very severe punishment, 42 years in prison, which would be

imposed even if the court acquitted defendant of the capital charge; because of this sentence, he had already been sufficiently punished for his crimes; therefore, he should not be additionally punished and especially should not receive the death penalty because of the happenstance—which was out of his control—that the victim died due to medical malpractice. To make this argument, counsel had to be sure the court knew of the prior plea and sentence. Counsel succeeded in having the best of both worlds, an agreement that the plea would not be used in deciding guilt of the capital charge, and the ability to argue that defendant had already been sufficiently punished.

It is true, as defendant argues, that attempted murder requires an intent to kill (*People* v. *Collie* (1981) 30 Cal.3d 43, 62 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776]), and therefore the guilty plea to attempted murder admitted one contested element of the capital charge. The court, however, understood that the negotiated plea to the noncapital charges was just that, a negotiated plea, and was not to be used in considering the murder charge. It decided the capital charge solely on the evidence and arguments at trial. Although counsel's tactics were unusual, under the equally unusual circumstances, and given the limited options he faced, we cannot say on direct appeal they were unreasonable.

Defendant argues counsel should have moved to disqualify the trial court. (See *ante*, pt. II.A.4.) "There are, no doubt, an infinite number of reasons why counsel would not avail themselves of the opportunity to disqualify a judge. The failure to do so is within the competence of counsel, and does not show ineffective counsel." (*People* v. *Beaumaster*, *supra*, 17 Cal.App.3d at p. 1009.) Trying to disqualify the judge would have been inconsistent with counsel's general approach to the defense. It would have been absurd for counsel to inform the judge of the prior plea and sentence and then to seek her disqualification because she had that information. In light of defendant's confession, it was also reasonable for counsel to believe that the comments the judge heard about witness Johnson, almost a year before trial (see *ante*, pt. II.A.3.), would not prejudice her. The record suggests counsel believed this particular judge was as favorable a forum as defendant was likely to get. On this record, we cannot find this belief unreasonable.

■ Defendant argues counsel was ineffective in advising him to waive a jury trial. We will, however, "not assume inadequacy of representation unless counsel had no conceivable legitimate tactical purpose" for waiving a jury. (*People* v. *Diaz*, *supra*, 3 Cal.4th at p. 558.) When defendant waived a jury, defense counsel stated on the record, in defendant's presence, that the "jury waiver [was] extremely well thought over, discussed over a lengthy period of time between [counsel] and defendant." The record suggests a

number of "legitimate tactical grounds" (*ibid.*) for the waiver. "Thus, counsel may have believed that the particular judge to whom the case was assigned would be sympathetic to defendant . . . ." (*Ibid.*) Counsel also might reasonably have believed it riskier to tell a jury about the prior guilty plea than a court, for no doubt a jury would find it more difficult than a court to understand that it could not consider the plea in deciding guilt on the capital charge. But it was important for the defense that the trier of fact be aware of the plea and the fact that a not guilty verdict to the murder charge would still leave defendant with a long prison sentence. Moreover, given the nature of defendant's crime—he set his victim on fire after raping and beating her in her own home—counsel might reasonably believe a court could and would consider the questions of guilt and penalty more dispassionately than a jury. Counsel might especially be concerned about a jury's reaction to the defense that medical malpractice rather than defendant's admitted act of setting the victim on fire caused her death. In rendering its penalty verdict, the court stated its belief that defense counsel "was very correct in his assessment that a court might deal with that issue somewhat differently than a jury would deal with that issue in evaluating its significance." Whether to try this case to a jury or a court was a difficult tactical decision that counsel and, with counsel's advice, defendant himself, had to make. "Making this decision . . . is not incompetence." (*People* v. *Freeman, supra*, 8 Cal.4th at p. 500.)

Defendant also argues that the decision to waive a jury was not based on a full factual investigation because counsel obtained discovery of some of the victim's medical records as late as during trial. He fails to show counsel's incompetence. Defending a criminal case, especially against capital charges, is, no doubt, a dynamic process, with investigation and preparation ever continuing. We do not know exactly what information counsel possessed when he advised defendant to waive a jury, although we do know that defendant had already confessed to the crime. On this record, we cannot say counsel had not investigated the case sufficiently to give advice within the range of reasonable competence. Counsel's continued investigation and preparation of the defense after the jury waiver does not itself indicate that the decision to waive a jury was uninformed. The record does not show that the later investigation uncovered anything that would have significantly affected the decision to waive a jury. The trial judge remained the same; the confession remained the same; the facts of the crime remained the same.

Defendant argues counsel should have objected to defendant's wearing jail clothing at trial. However, "there may be instances where for tactical reasons the defendant may wish to be tried in jail garb." (*People* v. *Taylor, supra*, 31 Cal.3d at p. 496, citing *Estelle* v. *Williams, supra*, 425 U.S.

at p. 508 [96 S.Ct. at p. 1695]; see also *People* v. *Williams, supra,* 228 Cal.App.3d at pp. 150-151.) The record suggests this case is one of those instances. Defense counsel could not realistically have argued his client was innocent of all charges and should not be in custody. Having defendant appear in jail clothing was consistent with the defense argument that defendant had already received a long prison sentence for his crimes and would not soon be released into society even if the court acquitted him of the murder charge. Counsel could reasonably have believed the jail clothing was also useful as symbolizing defendant's early admission of wrongdoing.

 Defendant contends counsel was incompetent for presenting the defense of lack of causation due to medical malpractice, arguing it "had no reasonable hope of success, because the law and the facts never supported" it. We have said that "If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations, including *People* v. *McGee* (1947) 31 Cal.2d 229, 243 [187 P.2d 706].] To be sure, when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause. [Citations, including *People* v. *McGee, supra,* 31 Cal.2d at p. 240.]" (*People* v. *Roberts* (1992) 2 Cal.4th 271, 312 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Defendant analyzes the evidence in great detail and concludes the defense could never have established grossly improper medical treatment. He also argues that because counsel did not obtain some of the medical records until trial, he had not made an informed decision to raise the defense.

We need not consider the likelihood that this defense would succeed. For present purposes, we may assume defendant is correct that the defense was a forlorn hope. That assumption, however, does not establish that counsel was incompetent for trying it. Many defenses are hopeless, or nearly so. A defense attorney has to make do with the facts presented. On this record, in light of defendant's confession, we cannot say counsel had a better alternative available. Indeed, given the 10 months between the crime and the victim's death, and the strong evidence of malpractice, we suspect defendant would be at least as vociferous as he is today in claiming incompetence had counsel *not* attacked the question of causation or presented no defense whatever.

The record shows that the defense did not obtain some of the medical records until trial. When the prosecutor showed the defense expert witness certain records on cross-examination, the witness said he had not previously seen them. Defendant argues that, with the aid of these records, the prosecutor elicited a damaging concession from the defense expert, thus further

showing counsel's incompetent representation. We do not know why the defense witness had not seen the records before he testified, but his failure to review them does not aid defendant's position. Defendant argues that counsel should not have presented the malpractice defense, not that better preparation might have caused it to succeed. The prosecutor's effective cross-examination does not demonstrate that a better alternative existed. In a capital case such as this, competent counsel could reasonably elect to present the malpractice defense even assuming, as defendant now argues, it was hopeless. Moreover, the defense had a spillover effect on the penalty phase, where counsel argued the intervening malpractice was at least mitigating.

Defendant argues counsel at least should not have made medical malpractice the "sole defense theory." Counsel did not. He vigorously argued the prosecution had not proven the required mental state beyond a reasonable doubt. Defendant claims counsel should have presented a defense of voluntary intoxication due to cocaine use. Counsel did. Johnson testified that shortly before the crime, defendant "smoked some cocaine" and "was getting high." Defendant told the police that he had purchased some cocaine and that he "did a couple lines of coke." Defense counsel elicited much of this testimony on cross-examination. Although counsel did not present additional evidence, he argued that the cocaine use showed "diminished actuality, and that is the actual ability of [defendant] to formulate the intent to kill." On this record, we cannot say that counsel had available or should have presented additional evidence.

Defendant also contends counsel incompetently argued the question of his mental state. Because the crime occurred after our decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] and before *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], the parties and court correctly recognized that the former governed this case. (See *People* v. *Duncan* (1991) 53 Cal.3d 955, 973, fn. 4 [281 Cal.Rptr. 273, 810 P.2d 131].) Defense counsel argued to the court that under *Carlos*, the court would have to find premeditation and not just an intent to kill. Ultimately, the court, citing a Court of Appeal decision (*People* v. *Epps* (1986) 182 Cal.App.3d 1102 [227 Cal.Rptr. 625]), disagreed. Defendant claims counsel's argument shows he incompetently misunderstood the law. On the contrary, counsel made a forceful legal argument for his client, albeit one that the court correctly rejected. A good advocate often argues the law is, or should be, more favorable to the client than it actually is. Counsel did not solely argue the absence of premeditation. He also argued the prosecution had not established intent to kill. Making multiple layers of arguments is generally effective, not incompetent.

Defendant claims his attorney "waived every potentially meritorious defense and issue at the guilt phase." On the contrary, except for the meritless

double jeopardy claim, defendant waived no defenses, potentially meritorious or otherwise. Counsel forced the prosecution to prove every element of the murder charge and special circumstance and strongly argued the issues of causation and intent to kill.

Defendant finally argues that "Pursuant to [*United States* v. *Cronic* (1984) 466 U.S. 648 (104 S.Ct. 2039, 80 L.Ed.2d 657)], reversal is required without regard to prejudice where, as here, defense counsel's ineffectiveness rendered the proceedings a non-adversarial sham." We disagree. Defendant received a fully contested adversarial trial. Counsel made a number of tactical decisions, some unusual, but, so far as the record shows, all reasonable under the circumstances. Given defendant's complete confession to the capital charge, we also find no reasonable probability that some other defense would have resulted in a more favorable verdict. Based on this record, we find counsel's performance does not undermine confidence in the outcome.

### B. *Penalty Phase Issues*

#### 1. *Claims of Prosecutorial Misconduct*

██ Defendant contends the prosecutor committed numerous acts of misconduct. He objected to none. It is settled that, following a jury trial, a claim of misconduct is not cognizable on appeal absent a timely objection if an objection and admonition would have cured the harm. (*People* v. *Davis* (1995) 10 Cal.4th 463, 537 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People* v. *Webb* (1993) 6 Cal.4th 494, 533 [24 Cal.Rptr.2d 779, 862 P.2d 779].) Here, the trial was to the court. The same rule applies, but we must adapt it to reflect the fact there was no jury to admonish. Absent a timely objection, a claim of prosecutorial misconduct is not cognizable on appeal following a court trial if an objection would have cured the harm. Under this rule, none of defendant's contentions is cognizable. Even if the prosecutor had engaged in any misconduct, there was no jury to mislead. It is very unlikely the misconduct would have had a significant effect on a trial judge. An objection could easily have cured any harm. All of the contentions also lack merit.

██ Defendant argues the prosecutor improperly elicited testimony from defendant's two earlier assault victims, Paula H. and Violet H., that defendant claimed he had "killed before." Paula H. testified defendant "told me that he had killed someone before and that he wouldn't mind doing it to me." The prosecutor explained that the evidence was "not offered as any evidence that [defendant] had previously killed anyone. I have no such competent evidence. However, . . . it's offered as a relevant part of the threatening

conduct that occurred on this occasion and for that purpose only." Violet H. testified defendant "said that, 'I have killed,' like 'I've killed recently, and I will kill again.' " The prosecutor again explained that "any reference to any killings is not offered to establish that such a killing occurred, but only . . . relative to the threats that were made and the conduct on this occasion."

We see no impropriety. Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony (*People* v. *Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217]), merely eliciting evidence is not misconduct. Defendant's real argument is that the evidence was inadmissible. That claim, too, is not cognizable because he failed to object. (*People* v. *Raley* (1992) 2 Cal.4th 870, 892 [8 Cal.Rptr.2d 678, 830 P.2d 712].) Moreover, the evidence was admissible to show the extent to which defendant terrorized his victims. "[T]he People may properly present evidence showing the circumstances of the prior violent criminal activity." (*People* v. *Brown* (1988) 46 Cal.3d 432, 445 [250 Cal.Rptr. 604, 758 P.2d 1135].) The prosecutor expressly did not claim defendant had actually killed before.

Defendant contends the prosecutor's reference to having no "competent" evidence implied that he possessed some other kind of evidence—presumably incompetent evidence—that defendant had killed before. We do not believe, however, that a trial judge would be misled so easily. It is not reasonably likely the judge considered the remark to imply that defendant had actually killed before. (*People* v. *Clair* (1992) 2 Cal.4th 629, 663-664 [7 Cal.Rptr.2d 564, 828 P.2d 705].) No one, including the judge, ever referred to any actual prior killing. The case of *People* v. *Robertson* (1982) 33 Cal.3d 21, 41-42 [188 Cal.Rptr. 77, 655 P.2d 279], which defendant cites, does not aid him. There, at the *guilt* phase, the prosecutor elicited testimony from a victim that defendant said he had killed two others. We found defense counsel ineffective for not objecting because, assuming the evidence had some theoretical relevance to guilt, its prejudicial effect outweighed its probative value. Here, the evidence was clearly probative at the *penalty* phase, and, given the prosecutor's explanation of the limited purpose for which he offered it, it had no improper prejudicial effect.

The prosecutor elicited testimony from Paula H. that she "believe[d]" defendant was going to kill her and from Violet H. that "the last thing I remember was when I knew mentally that he was killing me." This testimony was also admissible to show the circumstances of the prior violent criminal activity and the terror defendant inflicted. The prosecutor did not, as defendant argues, use this testimony to characterize the prior crimes as " 'attempted murders,' " and a court would not likely view it as such.

Defendant's additional argument that the prosecutor provided inadequate notice of these portions of the victims' testimony also lacks merit. "The statute does not require production of the evidence, however, but notice of it. ([Pen. Code,] § 190.3.) The prosecutor provided notice that [the victims] would be called to testify about the [crimes against them]. The defense was not entitled to a summation of the witnesses' expected testimony." (*People* v. *Roberts*, *supra*, 2 Cal.4th at p. 330.)

▓▓▓ Violet H. testified that defendant had impregnated her 14-year-old daughter. About two hours before defendant assaulted her, she told him she wanted him to end his relationship with her daughter. He told her "that I will make sure she'll never, ever want to be near or around a black man again." Defendant argues that by eliciting this testimony, the prosecutor "improperly injected the irrelevant issue of race into the proceedings . . . ." On the contrary, defendant himself injected race into his criminal behavior. This evidence was relevant to show the circumstances, including motivation, of the other violent criminal activity. "The prosecutor was entitled to elicit the facts surrounding defendant's assault on [Violet H.]; the racial [comment] came from defendant's own mouth." (*People* v. *McPeters* (1992) 2 Cal.4th 1148, 1189 [9 Cal.Rptr.2d 834, 832 P.2d 146].) Defendant also claims the prosecutor improperly referred to this testimony in his penalty argument to the court. We disagree. As the evidence was proper, so too was the prosecutor's brief reference to it.

▓▓▓ In arguing for a verdict of death, the prosecutor stated, "I don't take the decision to seek death any more lightly than I expect this court to take the decision of whether or not to impose it. Somebody doesn't hand me a case from my office and say, 'We've decided this is a death penalty case. You go do it.' It's a mechanical thing, you do your job. I don't work that way. I don't expect the court to work that way. I'm given a case, and I'm asked to evaluate as to what I think the appropriate penalty would be to seek and make recommendations. And my office has not and never will require a prosecutor to go forward with a case simply on the grounds that it's our job." Defendant contends, "The prosecutor improperly argued his own decision-making process in support of his request that a death sentence be imposed." We see nothing improper, and certainly nothing that would have misled the court sitting without a jury. The decision to seek death, just as the decision to impose it, is obviously weighty. The prosecutor merely made clear he took the matter very seriously, just as he expected the court to. He did not suggest that the importance of the decision was itself a reason to impose death, nor did he undermine the court's own sense of responsibility for its decision. Moreover, although a prosecutor may not state a personal belief that death is proper based on facts not in evidence, he may argue a belief that

the *facts of record* warrant death. (*People* v. *Rowland* (1992) 4 Cal.4th 238, 280-281 [14 Cal.Rptr.2d 377, 841 P.2d 897].) The prosecutor appropriately made the latter argument.

■ The prosecutor urged the trial court to view the case from victim Jensen's perspective and analyzed what Jensen's thoughts and feelings must have been. Defendant contends the prosecutor improperly argued facts not in evidence and relied on inadmissible victim impact evidence. The argument, however, was based on reasonable inferences from the evidence. We have long held that, *at the penalty phase*, assessing the offense from the victim's viewpoint is germane to the sentencing decision. (*People* v. *Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776]; see *People* v. *Edwards* (1991) 54 Cal.3d 787, 834-835 [1 Cal.Rptr.2d 696, 819 P.2d 436].) Emotion must not reign over reason (*People* v. *Haskett, supra*, 30 Cal.3d at p. 864), but the argument was not unduly emotional.

The prosecutor argued Jensen's murder was "an execution" carried out with "no procedural safeguards." Contrary to defendant's contention, the argument was legitimate comment on the "circumstances of the crime of which the defendant was convicted in the present proceeding" (Pen. Code, § 190.3, factor (a)); it was supported by the evidence; and it did not preclude the court from considering any relevant mitigating factor.

■ Defendant contends the prosecutor improperly argued that the absence of mitigating evidence was itself aggravating. The prosecutor's argument was proper. He argued that the psychological evaluation that the defense offered in mitigation did not contain "the kind of mental impairment that would arise to a mitigating circumstance . . . ." Although the absence of mitigation is not itself aggravating, the prosecutor may argue the evidence of mental state does not in fact mitigate. (*People* v. *Sims* (1993) 5 Cal.4th 405, 463-464 [20 Cal.Rptr.2d 537, 853 P.2d 992].) Contrary to defendant's contention, the prosecution's argument that defendant "hates and disrespects women and has a total absence of conscience, a man utterly devoid of compassion," and that defendant killed Jensen for "sexual or hate gratification, power gratification" is also a fair comment on the psychological evaluation and the evidence of defendant's crimes. Referring to defendant's statements to the police about "Tony," the prosecutor also argued that defendant was "feigning a mental illness, by feigning a second personality." Defendant argues there was no evidence to support the claim he was feigning mental illness. There was little evidence either way about defendant's mental condition. Given the state of the evidence, and the context in which defendant talked to the police about "Tony," the brief argument was also a fair comment on the evidence not likely to mislead the court.

The prosecutor argued that "Life without parole doesn't mean that one does not commit another murder. It means that one is relegated to the potential victims available in the state prison system, fellow inmates." He also described defendant as a "sociopathic killer." Argument directed to future dangerousness and the possibility the defendant might kill another prisoner is permissible when, as here, it is based on the evidence of defendant's past conduct rather than expert opinion. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 249 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

### 2. Claims of Trial Court Error

Defendant contends the "court's failure to make a complete record precludes full and fair review on appeal . . . ." The court stated detailed reasons for selecting the death penalty. Defendant argues the statement "left unclear whether the correct legal standards were applied . . . ." We disagree. The court was not obligated to state any reasons for its verdict. Whether trial is by jury or court, the sentencer has no obligation to make factual or legal findings. "As with a jury, a judge sitting as the trier of fact must make a specific finding of the truth of each alleged special circumstance, and at the time of the automatic motion for modification, the court must state the reasons for its findings. ([Pen. Code,] § 190.4, subd. (e).) These protections are sufficient to ensure adequate appellate review." (*People* v. *Diaz, supra*, 3 Cal.4th at p. 572.)

Defendant argues that without a reference to jury instructions or other express statement, a reviewing court cannot determine whether the trial court applied the correct standards. Again, we disagree. "As a general rule, we presume that the trial court has properly followed established law." (*People* v. *Diaz, supra*, 3 Cal.4th at p. 567.) Contrary to defendant's argument, the record here gives no reason to doubt that the court applied the correct law. Unlike *People* v. *Diaz, supra*, 3 Cal.4th at pages 567-568, the trial occurred after *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] clarified the scope of the penalty phase sentencing discretion. At the outset of trial, the court stated that it ". . . will use the same standards and rules of law that I would have read to a jury, if there was a jury, in determining whether or not death is the appropriate penalty . . . ." Citing *Brown*, defendant argues that the court's statement of reasons "suggests a mandatory formula rather than the moral weighing process required to determine the appropriate penalty." It does not. Although the court said at one point that the mitigating factor of the negligent medical care that contributed to the victim's death was "not enough to outweigh the overwhelming factors in aggravation," the court concluded its analysis, "I now find that the aggravating factors outweigh the mitigating factors and hereby fix the penalty as death." We find no reason to doubt that the court applied the correct law.

The court specifically did "not find that [defendant] was impaired by any mental disease or defect" and found "that even though there was drug use, that he was not impaired by the effects of intoxication." Therefore, it found these factors "not mitigating." Defendant contends that the court erroneously "refused to consider" in mitigation the evidence of his cocaine use shortly before the crime and mental disturbance, as indicated by his references to "Tony" to the police. We disagree. The court did not refuse to *consider* any evidence. It merely found that some evidence did not, in fact, mitigate.

 As defendant argues, the court may not be precluded from considering any potentially mitigating evidence the defendant offers. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1].) California's death penalty statute does not preclude any such consideration. Once the sentencer considers the evidence, however, it is not required to find that any particular evidence does in fact mitigate. "Defendant appears to assume that the court was required to conclude that the evidence he had offered in mitigation did in fact amount to a mitigating circumstance. The assumption is unsound." (*People* v. *Berryman* (1993) 6 Cal.4th 1048, 1107 [25 Cal.Rptr.2d 867, 864 P.2d 40].) There was no evidence that defendant's cocaine use affected the crime or that his references to "Tony" were genuine or showed any mental impairment. The court properly considered the evidence and then found it not mitigating.

The court considered in aggravation both defendant's convictions for the crimes against Paula H. and Violet H. and the circumstances of those crimes. Defendant claims the court erred in admitting evidence of the facts underlying the convictions. As he did not object, the issue is not cognizable on appeal. (*People* v. *McPeters, supra*, 2 Cal.4th at p. 1188.) Moreover, we have repeatedly upheld the admissibility of such evidence. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 51-52 [23 Cal.Rptr.2d 593, 859 P.2d 673]; *People* v. *Odle* (1988) 45 Cal.3d 386, 423-424 [247 Cal.Rptr. 137, 754 P.2d 184]; *People* v. *Hovey* (1988) 44 Cal.3d 543, 577-579 [244 Cal.Rptr. 121, 749 P.2d 776].) Defendant also argues the court erroneously "double-counted" the convictions under Penal Code section 190.3, factor (c), and the underlying criminal activity under Penal Code section 190.3, factor (b). Because the two statutory aggravating factors serve different purposes, however, the court may generally consider both. (*People* v. *Melton* (1988) 44 Cal.3d 713, 764-765 [244 Cal.Rptr. 867, 750 P.2d 741].) There was no error regarding the crime against Paula H.

It is also clear the court could properly consider the conviction for raping Violet H. to establish the existence of other violent criminal activity under Penal Code section 190.3, factor (b). (*People* v. *Jackson* (1996) 13 Cal.4th 1164, 1234 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People* v. *Ray* (1996) 13

Cal.4th 313, 363-369 [52 Cal.Rptr.2d 296, 914 P.2d 846] (conc. opn. of George, C. J.).) However, a conviction that *postdates* the capital crime is not a "prior felony conviction" under Penal Code section 190.3, factor (c). (*People* v. *Webster* (1991) 54 Cal.3d 411, 453-454 [285 Cal.Rptr. 31, 814 P.2d 1273]; *People* v. *Balderas* (1985) 41 Cal.3d 144, 201 [222 Cal.Rptr. 184, 711 P.2d 480].) It is not immediately obvious how this rule applies to the conviction for raping Violet H. Defendant assaulted Jensen *before*, but the capital crime was not completed until Jensen died *after*, that conviction. In *People* v. *Balderas, supra,* 41 Cal.3d at pages 201-202, we explained that the rationale for limiting factor (c) to *prior* convictions is that unless the conviction occurred before the criminal acts, it could not have had a deterrent effect. Accordingly, the date of the criminal acts, and not the date of the last event needed for prosecution, determines whether a conviction is a "prior" conviction. As defendant committed his criminal acts against Jensen before his conviction for raping Violet H., the court should not have considered that conviction as an aggravating factor under Penal Code section 190.3, factor (c), separate from the criminal activity itself.

The error was not prejudicial. The court was aware that the conviction postdated the capital criminal acts. "Once the brutal facts of the [crime] were disclosed, '[t]he additional fact that defendant was *convicted* of that offense could have added very little to the total picture considered by'" the court. (*People* v. *Webster, supra,* 54 Cal.3d at p. 454, original italics.)

### 3. *Claims of Ineffective Assistance of Counsel*

Defendant argues his attorney was also ineffective at the penalty phase. Like the similar guilt phase contentions, we must reject the claims on this record, which provides no basis on which to conclude counsel could or should have presented a better defense case.

Defendant contends counsel incompetently failed to object to the admission of evidence, acts of prosecutorial misconduct, and "double-counting" of the prior crimes discussed above. The decision of when to object is inherently tactical, and the failure to object will seldom establish incompetence. (*People* v. *Frierson* (1991) 53 Cal.3d 730, 747, 749 [280 Cal.Rptr. 440, 808 P.2d 1197].) For example, counsel may have been confident that the court would accept at face value the prosecutor's statement that he had no "competent evidence" that defendant had killed before and would base its verdict solely on the evidence and not on speculation about some unknown murder. Moreover, as discussed (*ante,* pts. II.B.1., 2.), the prosecutor committed no misconduct, all evidence was properly admitted, and the only instance of court error was harmless.

Defendant contends counsel incompetently introduced evidence in the penalty case. In addition to cross-examining Paula H., the defense presented some of her testimony at the 1983 preliminary hearing. He argued to the court that the earlier testimony made defendant's crimes appear less serious than the trial testimony. For example, at the preliminary hearing, the victim described events after the initial assault in which defendant was apologetic and she appeared willing to help him clean up and escape, testimony which arguably added a mitigating flavor missing from the penalty phase testimony. We cannot say that presenting this testimony was unreasonable. The decision whether to use the victim's prior testimony is the sort of tactical decision competent counsel routinely must and do make.

Counsel also presented a 1983 psychological evaluation of defendant prepared in conjunction with the prosecution for the crimes against Paula H. The decision to present the psychological evaluation also comes within the wide range of competence. Defendant argues that the report was aggravating, not mitigating, and the prosecutor was able to use it to his own advantage. But mitigation and aggravation are in the eye of the beholder and must be judged relative to the crimes. Counsel had to make some hard decisions. He had to defend his client, but he also had to be realistic. His client had been convicted of very serious crimes against women, including burning one to death. To try to portray that client as a good citizen was unrealistic. All counsel could realistically do was try to mitigate, try to portray defendant as less evil than his acts indicated. As counsel recognized at trial, "there are some things [in the report] that are harmful in terms of [defendant] in there in a traditional sense," but he also urged that "there are not things that argue for his death." A neutral person, not a defense-retained expert, prepared the report, thus giving it credibility. The report described defendant "as an angry young man who views the world in general and women in particular quite negatively. He is quite sensitive to racial prejudice and sometimes uses that as a reason for things which happen to him in life." The report was a springboard for counsel to argue that defendant's crimes, if not condonable, were somewhat understandable, and not of the extreme caliber worthy of death.

Counsel wove the evidence he presented into his penalty phase argument. Defendant claims that argument was itself incompetent. We disagree. It was detailed and factual, and it recited a number of reasons why the court should impose a sentence of life imprisonment rather than death. Specifically, defendant criticizes counsel's argument regarding prior victim Paula H. in a number of respects. It seems to us to have been a valiant effort to minimize the impact of this aggravating evidence. Counsel also competently responded to the prosecutor's argument regarding defendant's supposed future

dangerousness with counterargument that defendant would not be dangerous in a prison setting. Relying heavily on the psychological evaluation, counsel argued that the crimes were the rash acts of an "angry young man" with a "basic fundamental dislike, hatred for women," and that "the rash behavior that we are talking about here simply is not warranting of the death sentence." Under the circumstances, the argument was reasonable and realistic. Counsel could not completely sugarcoat defendant's crimes. He could reasonably have believed the best approach was to argue they were the rash acts of an angry young man rather than the cool, calculated acts of an irredeemably evil person.

■■■ In sum, so far as the appellate record shows, counsel conceived and carried out specific strategies to defend his client against a death verdict: He argued that the happenstance of medical malpractice that made this a murder case rather than attempted murder mitigated against the death penalty; he portrayed the crimes against Paula H. as less serious than her trial testimony suggested; he portrayed defendant as an "angry young man" who committed rash acts rather than a merely evil person who committed calculated crimes; he argued that the crimes against women were not the type to be repeated in prison; he argued that defendant admitted his wrongdoing at an early stage; he cited defendant's "split personality" as evidenced by the references to "Tony"; and he urged that defendant's conduct was not the type for which the death penalty was designed. On this record, we cannot say that some other approach was so clearly superior that counsel's representation was incompetent. The penalty trial, like the guilt trial, was fully adversarial, and counsel's performance does not undermine confidence in the outcome.

### 4. *Automatic Motion to Modify the Verdict*

Defendant challenges the court's denial of his automatic motion to modify the verdict. We have never decided whether a defendant who waives a jury is even entitled to a modification hearing. The statutory language is ambiguous. (See *People* v. *Diaz, supra,* 3 Cal.4th at p. 575 & fn. 35.) We need not decide the question here, for the court held the hearing, and we find no error.

The court read the probation report before hearing the modification motion. Defendant correctly points out that, because the court reviews only the evidence presented at trial in ruling on the motion to modify, we stated after the hearing of this case that "the preferable procedure is to defer reading the probation report until after ruling on the automatic application for modification of verdict." (*People* v. *Lewis* (1990) 50 Cal.3d 262, 287 [266 Cal.Rptr. 834, 786 P.2d 892].) However, the court also expressly stated it would not consider the probation report except for anything favorable to defendant.

The court's reasons for denying the motion were based solely on matters presented at trial. Therefore, reading the report did not influence the ruling. (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 787 [9 Cal.Rptr.2d 72, 831 P.2d 297].)

Defendant complains that, "for no legitimate purpose," the probation report noted that the family of Violet H. is "white." He argues the reference shows the prosecution interjected race "in an aggravating context." It does not. The report said the victim explained that defendant had been dating her daughter, and that, shortly before the crime, defendant and a "white" male "went to the victim's home to discuss the problem of prejudice because the [H.] family is white." This reference to the victim's race was both innocuous and appropriate. Moreover, as noted, the court agreed not to consider anything in the report unfavorable to defendant and, because Violet H. testified at trial, the court already knew her race.

 Defendant claims his attorney represented him ineffectively at the modification hearing. He first argues counsel should have objected to the court's having read the probation report. However, the court agreed to consider the report only to the extent it *aided* defendant. Counsel acted competently by acquiescing in that agreement. Defendant also claims counsel incompetently discussed matters in the probation report that might be considered aggravating, such as defendant's longtime membership in the "Crips" gang and allegations of prison misconduct such as manufacturing alcohol. Counsel also referred to "possible conflict between those Crips that are in custody and a group known as the Aryan Brotherhood, which is a predominantly white racist group." At the hearing, counsel found himself in an unusual situation. His arguments based on the trial evidence had already failed. Counsel could reasonably believe that merely repeating what had not persuaded the court before was not the best strategy, and that something new was needed. Counsel argued, in effect, that defendant was the product of his violent environment, which was consistent with counsel's general theme that defendant was not the type of calculating criminal for whom the death penalty was intended. We cannot say this approach was unreasonable. Moreover, as it is clear the court based its decision to deny the motion solely on the evidence presented at trial, we see no prejudice from counsel's argument.

## 5. Cumulative Effect of the Errors

Defendant argues the cumulative effect of all the errors rendered the proceeding unreliable. The only error, however, was the court's citing defendant's conviction for raping Violet H. as a separate aggravating factor. It was clearly harmless. There was no other error to accumulate.

C. *Other Contentions*

Defendant contends the prohibition against double punishment bars the death penalty for two reasons. First, he argues that the trial court should not have considered the crimes and convictions regarding Paula H. and Violet H. because he had already been punished for those crimes. We disagree. (*People* v. *Garceau* (1993) 6 Cal.4th 140, 199-200 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Second, he argues he is being impermissibly punished both for the earlier convictions for attempted murder and rape and for the capital murder charge. This contention seems more directed to the earlier prison sentence than to the sentence in this capital case. The issue is moot for the attempted murder charge, for the court later dismissed that conviction in light of the murder conviction. The court ordered the sentence for Jensen's rape to run concurrently to the sentence in this case. Defendant argues that sentence should instead have been stayed under Penal Code section 654. The question seems to have little, if any, practical significance, but we need not decide it here, for the rape case is not before us. Whether the court should have stayed the rape sentence does not affect the validity of the death sentence in this case.

Defendant claims the death penalty is disproportionate to his personal culpability. We disagree. Given the nature of defendant's capital crime, in which he burned a human being to death after raping and beating her, and defendant's other serious crimes, the death sentence does not shock the conscience or offend fundamental notions of human dignity. (*People* v. *Davenport* (1995) 11 Cal.4th 1171, 1235 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) The trial court did find, as defendant argued at trial, that medical malpractice contributed to the victim's death. But, as the court noted in its penalty verdict, her death could just as easily have occurred immediately if, for example, the smoke alarm had not sounded, and the victim's five-year-old daughter had not rescued her. The intervening medical care was a mitigating factor for defendant to argue and the court to consider, but it does not, itself, make the death sentence disproportionate.

Defendant challenges California's death penalty law on several grounds we have repeatedly rejected. The failure to identify which factors aggravate and which mitigate does not render the statute unconstitutional. (*People* v. *Fudge* (1994) 7 Cal.4th 1075, 1126-1127 [31 Cal.Rptr.2d 321, 875 P.2d 36]; see *Tuilaepa* v. *California* (1994) 512 U.S. 967, 979 [114 S.Ct. 2630, 2638-2639, 129 L.Ed.2d 750].) The aggravating factors need not be proven beyond a reasonable doubt. (*People* v. *Berryman, supra,* 6 Cal.4th at p. 1101.) Use of the words "extreme" and "substantial" in Penal Code section 190.3, factors (d) and (g), does not impermissibly limit consideration of

mitigating evidence. (*People* v. *Turner* (1994) 8 Cal.4th 137, 208-209 [32 Cal.Rptr.2d 762, 878 P.2d 521].) California's death penalty law, including the felony-based special circumstances, sufficiently narrows the class of death-eligible defendants. (*People* v. *Crittenden* (1994) 9 Cal.4th 83, 154-156 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Prosecutorial discretion in deciding whether to seek the death penalty is constitutional. (*Id.* at p. 152.)

### III. CONCLUSION

The judgment is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied September 3, 1997.