Filed 11/19/20  In re E.A. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re E.A. et al., Persons Coming Under the Juvenile Court Law. | C091208 |
| BUTTE COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>S.A. et al.,<br><br>Defendants and Appellants. | (Super. Ct. Nos. 18DP000015, 18DP000016) |

Appellants S.A. (mother) and M.A. (father), parents of minors E.A. and M.A., Jr., appeal from the juvenile court's orders denying mother's petition for modification and terminating parental rights as to the minors.  (Welf. & Inst. Code, §§ 388, 366.26, 395.)[1]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

Mother contends the juvenile court erred by not considering her petition for modification requesting the juvenile court vacate its jurisdiction orders and hold a new evidentiary hearing on jurisdiction prior to termination of her parental rights. Father joins in this contention. Parents also contend the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied. We affirm.

## I. BACKGROUND

On January 24, 2018, Butte County Department of Health and Human Services (the Department) filed section 300 petitions on behalf of minors E.A. (born November 2016) and M.A. (born October 2015), based on allegations of serious physical abuse to, and failure to obtain medical care for, E.A., which had resulted in serious brain damage and developmental deficits. The petitions alleged E.A. had serious brain damage as a result of parents' physical abuse and that M.A. was at risk of suffering abuse and neglect as well.

E.A. had been admitted to Sutter Hospital on January 17, 2018, and a brain scan was performed which indicated that the minor had "black holes" in the brain, or a loss of brain mass. The treating physician indicated this condition could be the result of three possible circumstances: an infection, a major accident (which the parents reported had not occurred), or physical abuse. The physician believed that the sort of trauma suffered by E.A. was most likely the result of physical abuse, such as violently shaking the baby. E.A. was found to have "global developmental delay and failure to thrive." Her brain MRI was significantly abnormal and included a large cyst/hydrocephalus and subdural effusions with hemosiderin suggestive of intracranial bleeds, potentially of different ages, which were concerning for non-accidental trauma, especially considering the lack of other organic etiology.

2

The 14-month-old E.A. was reported to be the size of a three-month-old child, and had significant developmental delay in that she was unable to sit or roll over.[2] The minor was not eating solid foods and drank only six ounces of formula a day. Mother reported the minor had cried "non-stop" for the first three months and then, one day, she became quiet and would not eat.

The petitions also alleged that the minors' older sibling had been subjected to severe parental abuse and that parents had their parental rights terminated as to the sibling in May 2011. The sibling, Ma.A., had been admitted to the hospital when she was three months old with "significant injuries including fractures in both arms and both legs, multiple fractured ribs in various stages of healing, and four fractured vertebrae." Parents were convicted, after entering no contest pleas, of felony child abuse in connection with the abuse of Ma.A. (Pen. Code, § 273a, subd. (a).)

The juvenile court issued a protective custody warrant for E.A. and M.A. and the minors were formally detained on February 5, 2018. Parents were provided visitation. The jurisdiction hearing was set for February 22, 2018.

The jurisdiction hearing was continued numerous times over the course of the following year, first for mother's request to seek authorized funding for an expert witness (which was granted), and then for mother to obtain the expert and allow the expert to review and report his findings. Then, on January 10, 2019, as a result of parents' intentions to file a nomination to appoint the caretaking relatives as guardians, the contested jurisdiction hearing was vacated, and a jurisdiction and guardianship nomination hearing was set.

The jurisdiction hearing and guardianship nomination hearing took place on January 31, 2019. Parents objected to jurisdiction, although neither presented testimony

---

[2] These allegations were included in the amended petitions, filed in January 2018.

or further evidence. The juvenile court found the allegations in the petitions true, sustained the petitions, and set a disposition hearing and guardian assessment for March 28, 2019.

Prior to the disposition hearing, the relative caregivers expressed their interest in adopting the minors. Both minors were doing well in their care. Although M.A. did get upset when he had to say goodbye to parents after visits, he remained stable and had no major issues. He was "clearly very comfortable and happy" in the relatives' care, showed affection to his caregivers and looked to them for comfort. E.A. had substantially improved in foster care placement prior to being placed with her relative caregivers. The relative caregivers were able to provide even more focused care for E.A., making all of her many medical and developmental appointments a priority, and E.A. continued to progress in their care. E.A. could vocalize, but not form words, and could roll over, but not walk. She had a gastrostomy tube installed but had been slowly expanding her oral food intake. Parents were consistent in their visitation attendance and visits were positive and appropriate. The Department emphasized that while it may never know exactly what happened to E.A. to cause her medical issues, whatever the precise (and likely nonaccidental) cause, parents should have recognized E.A. had urgent issues that required medical attention, and their failure to address those issues had caused permanent damage. The Department recommended parents be bypassed for reunification services pursuant to section 361.5, subdivisions (b)(6) [severe physical harm to sibling Ma.A. by parent] and (b)(11) [termination of parental rights to sibling Ma.A.] and, instead of guardianship, a permanent plan of adoption with the relative caregivers be pursued.

The disposition hearing took place on May 20, 2019. Parents objected to the Department's recommendation but did not present any testimony or additional evidence. The juvenile court declared the minors dependents of the court, ordered the minors removed from parental custody, bypassed parents for reunification services, and set a section 366.26 hearing.

The Department's report filed August 26, 2019, recommended termination of parental rights and a permanent plan of adoption. The minors continued to do well in their placement with the relative caregivers, the minors were considered adoptable, and the caregivers were committed to providing permanency for them. M.A. was noted to be medically healthy but had a slight developmental delay. He was described as curious and content and showed no signs of struggling with his mental and emotional health. There were also no longer concerns about his transitions at the end of visits with parents and he appeared comfortable and happy in his placement home. E.A. had continued to make significant progress toward developmental goals since her placement with the relative caregivers.

Parents claimed, as they had claimed in sibling Ma.A.'s case, that a rare genetic condition was the cause of E.A.'s medical condition. They had continued to attend supervised visits twice a week. The visits were described as positive but unremarkable. The minors attended the visits, enjoyed limited time with parents, and returned home to the caregivers. Neither minor showed any negative reactions before or after visits. M.A. transitioned well after visits. Due to the extent of her brain injury, E.A. did not appear to benefit or face negative repercussions as a result of the visits. Visitation did not appear to disrupt the minors' daily routines but, because the case had been pending for well over a year, it had become established as part of M.A.'s routine. Accordingly, the Department recommended visitation be gradually reduced upon termination of parental rights to avoid the disruption of his routine. The juvenile court granted parents' request for funding for an expert witness to do a bonding study.

On October 23, 2019, mother filed a declaration and letter from Heather Kirkwood, an attorney in Washington state, and a preliminary report of Dr. Roland

Auer.[3]  According to the Kirkwood letter, dated July 17, 2019, she was contacted in February 2019, briefly reviewed records from January, 15, 2018, January 15, 2019, and April 18, 2019, and had concluded that E.A. has porencephaly—a rare disorder that presents with brain cysts, loss of brain tissue, and developmental delay.  She had also concluded that sibling Ma.A. had coagulation abnormalities and weak bones (rickets/osteopenia).  Dr. Auer's preliminary report, dated October 21, 2019, indicated he had been contacted by Kirkwood on February 21, 2019, who asked him to look at E.A.'s January 15, 2019 MRI scans.  His initial differential diagnosis included:  hydrocephalus, porencephaly, and subarachnoid cyst (of which he lists several possible types).  Several months prior to the preparation of his report, Auer was contacted by father's attorney, who asked him to provide a formal opinion based on a complete review of the medical records.  He agreed to do so but did not receive the medical records.  The additional information he did receive (including descriptions of the January 2018 MRIs and of E.A.'s delayed growth and development) was consistent with porencephaly.

On November 5, 2019, mother filed the bonding study and its addendum, prepared by Ce Eshelman.  The bonding study was based on interviews with the social worker and parents, parents' bonding self-reports, a review of court documents, and a parent-child observation during a scheduled visit.  Other assessment methods, such as a child attachment assessment, projective drawing assessment, or sentence completion assessment were not administered due to the age or ability of the minors.  Eshelman found parents' narrative of how they lost parental rights to Ma.A. and were now facing the same fate with E.A. and M.A., despite their adamant denial that they abused any of the children, to be "compelling and heart-wrenching."

---

[3] The documents were not filed in connection with a motion or petition.  The submission referenced October 24, 2019, which was the trial readiness date.

Eshelman observed parents' contact with the minors to demonstrate their love and bonds to the minors. They were engaged and attentive to both minors' needs, collaborating in an unforced and cooperative manner. Mother demonstrated an understanding of E.A's nonverbal communication and accommodation of E.A.'s preferences and needs. E.A. made eye contact with mother and demonstrated smiling and engaging vocal noises toward mother. M.A. referred to parents as "mom" and "dad," demonstrated deference to parents' instructions, and sought positive attention such as being watched while performing challenges. He was not, however, overly verbally affectionate and showed "little demonstrative physical affection toward either parent."

Eshelman noted that, given the infrequency of visits, more enthusiasm upon seeing parents and more fanfare upon departure might have been expected. Neither minor, however, showed big overtures of affection upon greeting or distress upon departing. Eshelman concluded that parents were clearly bonded to the minors. They had more difficulty parting than the minors, prolonging goodbyes and making many overtures. Eshelman stated that, due to her disabilities, it was "not possible to fully assess the strength of [E.A.'s] attachment to her parents. However, she does not shy away, fuss, or refuse either parent's engagement or affection, though it is unclear how much she comprehends. I am, therefore, determining that she demonstrated attachment to her parents by her frequent smiling[,] laughter[,] and lack of distress." M.A. clearly enjoyed parents' company. Eshelman concluded that both minors appeared attached to parents. She remarked that "[a]ttachment is one of the most important aspects of child development—wounds to which last a lifetime," and concluded that "[d]ue to the quality and significance of the attachment [the minors] have with their parents," it was her opinion that adoption was not in their best interest.

The section 366.26 hearing commenced on December 5, 2019. Adoption specialist Rachelle Duvall testified that the minors were adoptable and that she believed adoption was in their best interest. She had reviewed the visitation notes that described

the parents' visits as "unremarkable" and explained that this meant the "emotional states of the children do not change from when the caregivers drop them off to bring, and spend time, and have visits with parents, there's no change in emotion or mood. They're just stable, which means . . . they have those bonds with their current caregivers, so there's no disruption between." Duvall did not believe there were any benefits to maintaining the relationship with parents that would outweigh the benefits of adoption.

Visitation coordinator Deanne Perry testified she had been supervising visits since March 2018. Parents' visits were heavily supervised and were always positive. Parents behaved in a parental manner, not just like friendly visitors, working together, switching roles, and sharing responsibilities during visits. The relationship between parents and the minors appeared positive and akin to a "close-knit family." When visits were recently reduced to once a month, however, she did not notice a lot of difference in the minors' behaviors. M.A. would sometimes cry at the end of visits, but not inconsolably so. He generally transitioned well back to his caregivers. E.A. never cried at the end of a visit. The minor's caregiver confirmed M.A. used to ask about seeing parents but he no longer asked about seeing them or appeared upset about not seeing them. M.A. referred to the caretakers as "mom and dad."

Eshelman testified as an expert in the area of bonding, attachment, and trauma. She testified that when conducting a bonding study, she examines a number of factors including a historical perspective of the preexisting relationship between the child, as well as the child's age. It was her belief that it is better to terminate parental rights for an older child than a younger child. However, age is not a factor in whether a child is attached to a parent. A child is either attached or not attached.

As part of her bonding assessment in this case, Eshelman observed a four-hour visit between the parents and minors. During this observed visit she would have expected the minors to show "big overtures of affection upon greeting or distress upon departing," but she did not observe any such behavior during the visit. M.A. was not as

"enthusiastic" with parents as she would have expected of a child who is attached, but he clearly enjoyed being with them. E.A., despite her severe disabilities, was able to communicate with parents, who understood and were responsive to her needs. Based on these observations, Eshelman concluded the minors "behaved in a very attached way" and were "very attached" to parents.

Eshelman believed it would be detrimental to the minors "to allow them to be adopted and terminate . . . parental rights." Her opinion was based upon her "awareness of attachment, trauma, and what it does to the brain of a child for its lifetime." She testified that all children have implicit memory of their biological parents for the first 33 months of the child's life and, regardless of the child's age, the child will be "impacted for a lifetime" by losing their biological parents. "If they lose their biological parent under the age of 3, within the first 33 months, they're going to be more significantly impacted." She testified that the California dependency system is "lag[ging] behind evidence based models" and that the "permanency priority is mistaken." In her opinion, terminating parental rights is always detrimental to a child "but you can weigh what else might be more detrimental." She explained that she would not say maintaining parental rights with a parent who is abusive is a better choice than adoption and, in cases where a child is being abused by a parent, it would be appropriate to terminate parental rights. She acknowledged that the court believes what occurred in this case was abusive but she, personally, did not think that it was likely to recur. She had come to "a different interpretation" and believed it was "like a one time, poor decision that was traumatic, granted," and that parents would need a lot of psychoeducation if they were to ever get their children back. She opined that permanency is important, but not more important that a securely attached biological family.

The juvenile court found the minors were likely to be adopted, that the beneficial parental relationship exception to adoption did not apply, and terminated parental rights. In finding the benefit from parental rights remaining intact did not outweigh the benefits

9

of permanency through adoption, the court rejected Eshelman's theory that adoption is almost never in a minor's best interests, but also found that the instant matter fell within Eshelman's acknowledged exception that adoption may be appropriate when parents are abusive.

## II. DISCUSSION

A.     *Mother's Petition for Modification*

On December 16, 2019—the third day of the section 366.26 hearing—mother filed a section 388 petition for modification requesting the court hold a new jurisdiction hearing.[4] Mother alleged parents had received a preliminary report from a physician-scientist concluding that, based on his review of E.A.'s scans, her condition was likely congenital, and had a second preliminary report from a different physician concluding that, based on a review of sibling Ma.A.'s scans, she likely had congenital rickets. Mother contends the juvenile court committed reversible error by failing to consider her petition until after terminating parental rights.

We reject mother's contention that the juvenile court "should have unequivocally considered the modification petition by either denying it without a hearing or setting a hearing, prior to ordering the termination of parental rights." Mother relies on *In re Alayah J.* (2017) 9 Cal.App.5th 469 (*Alayah J.*), which found the juvenile court erred when it refused to hear the mother's petition for modification seeking unmonitored visits and a home assessment, unless or until it decided not to terminate parental rights.

---

[4] In her petition, mother states that the court made an order on May 20, 2019, sustaining the petitions and ordering no reunification for the parents. As set forth in the procedural background, the juvenile court sustained the petitions and made jurisdictional findings and orders on January 31, 2019. The court bypassed parents for reunification services in its May 20, 2019 dispositional orders. Mother's petition, however, requested only a new jurisdiction hearing.

However, unlike the mother in *Alayah J.*, mother here *expressly conditioned* her request that the court consider her petition on the court's decision to terminate parental rights.

In her petition, mother specified, "If the [c]ourt is unable to find that the beneficial relationship exception to adoptability applies and does not order guardianship, we ask the court to consider this motion." After the section 388 petition was filed on December 16, 2019, a discussion took place between the court, mother's counsel, and deputy county counsel about when the petition should be considered by the court. After the court acknowledged the filing, mother's counsel again specified that "we're only asking that [it] be considered if the [c]ourt finds that the exception to adoptability doesn't apply." Counsel for respondent objected to the timeliness of the filing and the lack of sufficient notice. The court deferred the decision until after the conclusion of the day's testimony of whether to delay argument and ruling on the section 366.26 matters to allow for proper notice on the section 388 petition or, instead, whether mother wished the court move on to argument and take the petition under submission. Father's counsel indicated he wished to have argument set for a later date since there had been three days of testimony. The court then noted that mother's petition was missing pages. Mother filed the missing pages on December 30, 2019, to be considered at the January 2, 2020 trial date.

Testimony continued and was concluded on January 2, 2020, the fourth day of the section 366.26 hearing. At the conclusion of mother's counsel's argument on the section 366.26 issues, she again asked that if the court did not find the parent-child relationship exception to adoption applicable, that the court set the modification petition for hearing. After the court issued its order terminating parental rights, mother's counsel inquired if the court was denying her a hearing or denying the petition for modification. The court responded, "I think it's kind of moot at this point. [¶] Would you like me to rule on it? JV-180 [petition for modification] is denied."

The record is clear that mother specifically conditioned her request that the court consider the petition for modification on its decision to terminate parental rights. She

11

expressly asked the court to consider it *only if* it found the beneficial parental relationship exception did not apply.  Mother cannot, therefore, now be heard to complain that the court did not consider her motion prior to deciding to terminate parental rights.

In any event, even if the court should have considered the merits of mother's petition prior to its decision to terminate parental rights, despite the qualification in the petition, the petition was ultimately and properly summarily denied as it failed to make the requisite prima facia showing.  This, too, distinguishes the instant matter from *Alayah J.*, in which the court did not rule on the mother's petition at all.  (*Alayah J. supra*, 9 Cal.App.5th at pp. 477, 480.)  It also forms the basis for our rejection of mother's contention that her appointed counsel provided ineffective assistance by not asking for a ruling prior to the court's decision to terminate parental rights.  Regardless of when the requested ruling was sought, the result would have been the same.  Thus, she cannot establish it is reasonably probable a more favorable determination would have resulted if counsel had requested the ruling earlier, which is required to obtain reversal based on the representation of counsel.  (*People v. Scott* (1997) 15 Cal.4th 1188, 1211 [appellant must show counsel's representation fell below an objective standard of reasonableness *and* the deficient performance was prejudicial in that it is reasonably probable a more favorable result would have occurred absent counsel's failings]; *People v. Kipp* (1998) 18 Cal.4th 349, 366-367 [appellate court need not consider whether the challenged actions were deficient if prejudice is not shown].)

Section 388, subdivision (a)(1) provides that a parent of a dependent child may petition the juvenile court "upon grounds of change of circumstance or new evidence . . . for a hearing to change, modify, or set aside any order of court previously made."  Section 388 permits modification of a dependency order if a change of circumstance or new evidence is shown and if the proposed modification is in the best interests of the minor.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.)  The party petitioning for

12

modification has the burden of proof by a preponderance of the evidence. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 48.)

Section 388 petitions for modification are to be liberally construed in favor of granting a hearing, requiring only a prima facie showing by the parent. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.) However, if when so construed, the petition fails to make a prima facie case both that there is new evidence/changed circumstances and that the minors' best interests would be served by changing the juvenile court's order, the court need not order a hearing. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) We review the summary denial of a section 388 petition for abuse of discretion. (*Ibid.*; see also *In re G.B.* (2014) 227 Cal.App.4th 1147, 1158; *In re S.R.* (2009) 173 Cal.App.4th 864, 870.)

Here, the new evidence or changed circumstance alleged in the petition to warrant the requested new jurisdiction hearing was that "[p]arents have received a preliminary report from a board-certified physician-scientist, neuropathologists *who based upon a review of [E.A.]'s MR scan images from 1/15/19*" opines that E.A. has severe porencephaly, which was likely congenital, and that her condition was likely not related to post-natal abuse. (Italics added.) The petition was also supported by a May 9, 2011 preliminary report prepared by Dr. Patrick Barnes and based on review of sibling Ma.A.'s May 2010 brain and skeletal imaging scans, concluding the scans strongly suggest the presence of congenital rickets as a result of a vitamin D deficiency and suggesting the case be reviewed by a specialist. Mother provided a history of her pregnancies, including the medications she took, her tobacco use, and the difficulties she incurred. The petition also attached a second declaration from attorney Kirkwood summarizing these doctor reports and summarizing mother's pregnancies.

As reflected above, the alleged new evidence was simply new expert opinions based on previously available evidence—scans that were completed prior to the jurisdiction hearing in this case. As we held in *In re H.S.* (2010) 188 Cal.App.4th 103,

13

105-107, on facts almost identical to those in the instant matter, the belated opinion of an expert based on evidence available at the jurisdiction and disposition hearings does not constitute new evidence within the meaning of section 388. (*In re H.S., supra*, at p. 107.) " ' "Public policy requires that pressure be brought upon litigants to use great care in preparing cases for trial and in ascertaining all the facts. . . ." [Citation.]' (*Kulchar v. Kulchar* (1969) 1 Cal.3d 467, 472; see *Baldwin v. Home Savings of America*[ (1997)] 59 Cal.App.4th[ 1192, ]1198.) A rule that would allow the reopening of cases previously decided, simply because a party identifies evidence that it could have presented at trial, but did not, ' "would in a large measure vitiate the effects of the rules of res judicata." [Citation.]' (*Kulchar v. Kulchar, supra,* []at p. 472.) [¶] This public policy applies even more forcefully to dependency cases, where delay is antithetical to the primary focus of dependency proceedings, the best interests of the child. (*In re Marilyn H.*[*, supra,*] 5 Cal.4th [at p. ]308.)" (*In re H.S., supra,* at p. 108.)

In response, mother argues we must, nonetheless, remand the matter to the juvenile court to determine whether she used due diligence in obtaining the subject expert opinions. Even if we were to conclude that the use of due diligence, but nonetheless failure, to obtain new expert opinions based on previously available evidence is an exception to the holding in *In re H.S.*, which we do not so hold, remand is not required. Here, mother requested, and the juvenile court approved, funding for an expert prior to the jurisdiction hearing. The jurisdiction hearing was then continued for *11 months*— from February 22, 2018, to January 31, 2019. Thereafter, *another 11 months* passed, during which time mother clearly "discovered" the "new" expert opinion (at the very least by October 23, 2019, when she filed Auer's preliminary report and Kirkwood's declaration with the court). Yet, no petition for modification was filed until the third day of the section 366.26 hearing on December 16, 2019.

Finally, we reject mother's contention that reversal is required because the Department did not object, and the court did not deny her petition, based on her failure to

14

allege new evidence. Whether the Department's objection that mother had been given plenty of time to gather these expert theories constituted an objection that she had not made a showing of new evidence is irrelevant. The burden to make a prima facie showing of either new evidence or changed circumstances to warrant a hearing was on mother. She did not make such a showing. And, while the court did not give all its reasons for summarily denying mother's petition, it did question mother's counsel to clarify that she had, in fact, retained the expert the court had authorized prior to the jurisdiction hearing, that expert (who was a pediatrician, not a neurologist) reviewed the extensive medical records, and she was not "able to get a response from him which would support fighting it."

In sum, mother was not entitled to a hearing on her petition because she failed to make a prima facie showing of the existence of any new evidence or changed circumstance to support her request for a new jurisdiction hearing. The juvenile court's summary denial of her petition was not error.

B.      *Beneficial Parental Relationship Exception*

Parents also contend the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied. We disagree.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from

15

continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception].)

To prove that the beneficial parental relationship exception applies, the parent must show there is a significant, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) And even if there is such a bond, the parent must prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575; accord *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1345.) "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, at p. 575.) On the other hand, " '[w]hen the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent[-]child relationship, the court should order adoption.' " (*In re Jasmine D., supra*, at p. 1350; see *In re Autumn H., supra*, at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, *it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.*" (*In re Jasmine D., supra*, 78 Cal.App.4th at p. 1350, italics added.) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53, quoting *In re Jasmine D., supra*, at p. 1348.) The beneficial parental relationship exception to adoption is an *exception* to the general rule that the court must

choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R., supra*, at p. 53.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

Parents did not meet their burden here. Although they maintained regular visitation and visitation went well, they failed to establish that the minors had such a significant, positive emotional attachment to them that the benefit of maintaining it outweighed the benefits the minors would obtain from adoption. (See *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Considering, as the court must, factors such as the age of the children, the portion of the children's life spent in the parent's custody, the positive or negative effect of interaction between the parent and the children, and the children's particular needs (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 811), the juvenile court did not err in determining the beneficial parental relationship exception to adoption does not apply.

By the time of the section 366.26 orders, the minors, who were detained at ages one and two, had been out of parental custody for almost two years. Their visits with parents had been positive but the minors were unaffected by visits being reduced from several two-hour visits a week to one hour per month and had not asked about visits after visitation was reduced. M.A. looked to parents for comfort during visits but otherwise looked to his caretakers, to whom he referred to as "mom and dad," for comfort. Although Eshelman would have expected the minors to show "big overtures of affection upon greeting or distress upon departing," this did not take place. M.A. enjoyed parents'

17

company but was not as "enthusiastic" with parents as Eshelman would have expected of a child who is attached, and neither child had trouble separating from parents at the end of visits. Additionally, while both young minors are in need of permanency, E.A.'s severe disabilities, special needs, and many medical and developmental appointments make her in particular need of the full commitment of her caretakers.

Father relies heavily on the testimony of Eshelman in arguing they met their burden to establish the benefits from a continued parent-child relationship outweighed the benefits of adoption in this case. Eshelman testified that children are either attached, or not attached, and that these minors were attached to parents. Father argues that this is "one of those 'rare cases' when the juvenile court failed to recognize the benefit of maintaining [the parents-child relationship]," but Eshelman did not testify that this is a rare case. To the contrary, she testified that an attached child is always irreparably and forever harmed by being put in "a toxic stress state that doesn't calm down," if parental rights are terminated. She believed, contrary to the Legislature's mandate, that adoption should not be the preferred plan because the detriment of losing contact with the biological parents always outweighs the benefits of permanency. The only exception she referenced was when the parents abused the child.

Even assuming the juvenile court was free to reject the Legislature's mandate that adoption is the preferred plan and controlling caselaw requiring the court consider certain factors when determining whether the benefits of maintaining a relationship with biological parents outweighs the benefits of adoption, it was free to reject Eshelman's theories, as well. An expert opinion is not binding on the court. The court, as trier of fact, may reject even uncontradicted testimony from an expert witness, as long as it does not act arbitrarily. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890.) Here, the court expressly considered Eshelman's testimony and theories, and rejected her theories as novel and untested. It also found that, considering the facts of this case, it was very clear that adoption was in the minors' best interests. Additionally, the court found

the instant case falls within the single exception Eshelman identified to her belief that preserving parental rights is always preferential to adoption—cases of abusive parents. Although Eshelman considered parents' denials of abuse to be "compelling" and preferred to think of the parents' actions as "medical neglect," the court had previously found, and unequivocally believed based on the evidence, that both E.A. and her sibling, Ma.A., had been abused, and both had been severely injured at the age of three months. The juvenile court also found it inexcusable and extraordinarily negligent that neither parent brought E.A. to get medical assistance for *a year* when something was very clearly wrong with her.

In sum, parents did not establish this to be "an extraordinary case" that preservation of parental rights must prevail over the Legislature's preference for adoptive placement. (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.)

### III.  DISPOSITION

The orders of the juvenile court are affirmed.


/S/
RENNER, J.

We concur:


/S/

DUARTE, Acting P. J.


/S/

HOCH, J.