Filed 2/26/21  P. v. Seales CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>TROY SEALES,<br><br>        Defendant and Appellant. | A155975<br><br>(Alameda County<br>Super. Ct. No. 17CR026867) |

A jury convicted defendant Troy Seales of murder and shooting at an occupied vehicle.  He contends that the trial court committed reversible error because it restricted the pretrial disclosure of a key witness's statements to defendant under Penal Code[1] section 1054.7.  He further claims the trial court erred in conducting the good cause hearing resulting in the restricted disclosure order in camera on an ex parte basis.  Defendant finally argues that his trial counsel rendered ineffective assistance of counsel.  Finding no merit in defendant's contentions, we shall affirm the judgment.

## I.    BACKGROUND

The Alameda County District Attorney filed an information charging defendant with the murder of Deandre Adams on or about August 25, 2017

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

1

(§ 187, subd. (a) (count one)) and shooting at an occupied motor vehicle (§ 246 (count two)).  The information alleged that defendant personally and intentionally discharged a firearm and caused great bodily injury and death (§§ 12022.53, subds. (c), (d), 12022.7, subd. (a)), and personally used a firearm (§ 12022.5, subd. (a), 12022.53, subds. (b), (g)).  A jury found defendant guilty as charged.  The trial court denied defendant's motion for a new trial, and it sentenced defendant to a total term of 50 years to life in prison. Defendant appealed.

## A. The Prosecution's Case

On August 11, 2017, defendant's sister used her Hertz Rental Car employee discount to rent a white Dodge Charger, and she listed defendant as an additional driver.

In August 2017, Doneisha Guidry lived with her mother, her two children, and Mercedes Tanner in a two-bedroom apartment located on 89th Avenue near Olive Street in Oakland, California.  Guidry's cousins, Kendrick Riley and his younger brother, Dupree Riley,[2] often hung out at her apartment.

On August 24, 2017, Kendrick, his son, and his son's mother stayed in the living room of Guidry's apartment.  In the morning of August 25, 2017 (August 25), Deandre Adams broke Guidry's car windows.  After the vandalism, defendant, the father of Guidry's children, came to her apartment in a white Dodge Charger.  Kendrick testified that defendant appeared that morning, and, at some point, he saw that defendant had a duffle bag.  Tanner, Dupree, Dupree's girlfriend, and Naja Sims-Harris (a cousin of Guidry, Kendrick, and Dupree) were also at Guidry's apartment on August

---

[2] We will refer to Kendrick and Dupree Riley by their first names to distinguish them.

25. At some point, Tanner, Sims-Harris, and Dupree walked to the corner store. Tanner testified that there were gunshots while they were at the store, and she saw a green Honda. Sims-Harris pushed Tanner into the store, and Tanner called Guidry to ask if defendant could pick her up. Tanner was not sure whether Dupree was inside or outside of the store when she called Guidry. Sims-Harris testified that Dupree left and did not come into the store with the two women.

Kendrick testified that, after leaving to go to the store with his two cousins, Dupree returned to Guidry's apartment and said that something happened at the store. Defendant, Kendrick, and Dupree walked out of the apartment together. Kendrick testified that he and Dupree ran to the store to check on their cousins, and Dupree carried a gun that fired blanks.

Defendant picked up Tanner and Sims-Harris at the store in the white Dodge Charger and dropped them back at Guidry's apartment. He then left. At about the time defendant dropped off Tanner and Sims-Harris, Kendrick and Dupree returned on foot. Kendrick, Dupree, and Sims-Harris spoke outside of the apartment building with Dupree's girlfriend, who was in her car. Kendrick, Dupree, and Sims-Harris heard gunshots. Sims-Harris heard about four gunshots, saw a dark green Honda driving fast on Olive Street, and ran into the apartment. Kendrick and Dupree ran towards the gunshots, but when they heard additional gunshots, they ran back to the apartment.

Around 10:20 a.m. on August 25, Damien Jackson was driving his black Audi on 89th Avenue and turned left off of 89th Avenue onto Olive Street. After he turned left onto Olive Street, he heard gunshots. He looked in his rearview mirror and saw a man shooting an AK-style rifle in his direction and a green car driving fast behind him. Jackson made a quick left turn onto

90th Avenue and looked over his shoulder. The driver of the green car was slumped, and the car was drifting to the right.

Around 10:20 a.m. on August 25, from her mother's house on the intersection of 89th Avenue and Olive Street, Megan Thompson looked out the window and saw a man shooting an assault rifle. Thompson described the shooter as a thin male about five feet, six or seven inches tall, having short black hair, lighter skin color (possibly Hispanic), and wearing a black shirt and baggy blue jeans.

Swazeere Dean, an EMT, lived near the crime scene. On August 25 around 10:20 a.m., his daughter woke him up and said that someone had been shot and crashed their car. Dean rendered assistance to Adams, who was in the crashed car and had two bullet holes through his chest.

Police recovered fourteen 7.62 rifle shell casings on Olive Street between 88th and 89th Avenues and a bullet fragment from a car parked on Olive Street and 89th. Criminalist Mark Bennet examined the bullet fragment and shell casings and determined that they were consistent with having been fired from an AK-47 assault rifle or an SKS-type rifle. Inspector Hawks, an expert on cell phone data analysis, determined that the cell phone defendant had been using moved north from Hayward to San Leandro and into Oakland near the crime scene between 9:00 a.m. and 10:18 a.m. on August 25. At 10:27 a.m., the cell phone pinged off a tower at 10850 MacArthur in Oakland and then moved southward to Hayward until 11:08 a.m.

## 1. Video Surveillance Evidence

The prosecutor showed surveillance video from the morning of August 25. The first video was recovered from 2036 89th Avenue and it showed both 89th Avenue and the parking lot in front of Guidry's apartment building.

4

The video showed Adams vandalizing Guidry's car. It also showed that, sometime later that morning, defendant parked a white Dodge Charger outside the apartment building, got out, and walked to the apartment building carrying a dark bag in his right hand.

The video then captured Dupree, Tanner, and Sims-Harris leaving the apartment, and subsequently showed Dupree running back into the apartment. Very shortly thereafter, defendant, Kendrick, and Dupree left the apartment together. Kendrick and Dupree looked around, defendant looked around, and defendant got into the driver's side of his car and drove in the direction of the corner store. Dupree then went back inside the apartment and came back out. At that point, Kendrick and Dupree ran down the street in the direction that defendant had driven. A couple minutes later, defendant returned in the white Dodge Charger, dropped off Tanner and Sims-Harris, and drove off. Surveillance video captured Damien Jackson driving his black Audi on 89th Avenue behind defendant as defendant pulled back onto the road after dropping the women off. Kendrick and Dupree then returned on foot and spoke with Dupree's girlfriend, who had pulled up on 89th Avenue in front of the apartment building. Kendrick and Dupree then suddenly took off running, again in the direction that defendant had driven.

The prosecutor also played surveillance video taken from 2006 89th Avenue on August 25. At trial, Kendrick confirmed that this video depicted a white Dodge Charger that looked similar to the car defendant drove on August 25. The white car turned right onto Olive Street at the intersection of 89th Avenue and Olive Street about sixteen seconds after 10:20 a.m. Damien Jackson confirmed that this surveillance showed him driving behind the white car and turning left onto Olive Street approximately twenty seconds after 10:20 a.m. At approximately forty-two seconds after 10:20 a.m.,

5

Kendrick and Dupree are depicted running on 89th Avenue towards the corner of the intersection with Olive Street, and Dupree extends his arm in what appears to be a shooting motion with a blank firing gun.

## 2. Kendrick's Statements and Testimony

When the police detained Kendrick on August 25, he told them he had been in Guidry's apartment when he heard gunshots and he did not know what happened. Kendrick claimed that he saw a white Dodge Charger parked down the street, but he did not tell police who had been driving the car. Kendrick did not tell the police that Dupree had a gun or that he had been involved in a crime.

On February 21, 2018, Investigator Basa and the prosecutor met with Kendrick. Kendrick was "very hesitant" to speak with them, and Basa assured Kendrick they would not record the conversation. Kendrick told them defendant drove a white Dodge Charger just before the shooting, and defendant had showed Kendrick a rifle in a duffle bag that day. Basa served Kendrick with a subpoena; Kendrick said that he was afraid to testify and feared for his family's safety.

On March 5, 2018, Investigator Basa and the prosecutor met with Kendrick again. They assured him that their conversation was not being recorded and showed him the surveillance video. After watching the video, Kendrick said there was no reason for him to lie. He said that defendant had been driving the white Dodge Charger on August 25, and defendant arrived at Guidry's apartment carrying a duffle bag. At some point, Dupree came into the apartment and said that Adams had shot at him. Defendant came out of Guidry's bedroom with a rifle and said he was going to "take care of this." Defendant, Kendrick, and Dupree left the apartment. When they reached the security gate, defendant "racked a round" and hid the rifle inside

6

his pants. Kendrick and Dupree served as lookouts while defendant put the rifle in the white Dodge Charger. Kendrick also said that, after the shooting, he overheard defendant on the phone tell Guidry, "You know what I'm about, and tell everybody keep their mouth shut." Further, a day or two after the shooting, defendant threatened Kendrick's safety and told him he had to leave. Kendrick told Basa several times that he was afraid to come to court to testify, and he took defendant's threats seriously.

At trial, Kendrick said defendant showed up at Guidry's apartment on August 25. He remembered defendant asking for a cigarette but claimed he did not hear defendant say anything else. He never saw defendant put anything in the white Dodge Charger. He could not remember if he saw defendant with a rifle that day or if he had told Basa that he had seen defendant with a rifle. He could not remember if he told Basa that defendant said something like, "I'm about to take care of this once and for all," or if he told Basa that that defendant put the rifle in his pants and told Dupree and Kendrick to "keep a lookout" as they left the apartment. Kendrick did not remember telling Basa that defendant "racked a round." Kendrick testified that he was aware that surveillance video showed everything, and the video was "accurate." Kendrick also conceded that he was honest with the prosecutor and Basa when he spoke to them. He admitted that he lied several times when he first talked to police because he wanted to protect Dupree.

### 3. Milisa English's Statement and Testimony

On September 10, 2017, police interviewed Milisa English, defendant's ex-girlfriend, after she contacted them. English said that, on the morning of August 25, while defendant was at her place, his "baby mama" called and told him something had happened. After the call, defendant said he was going to

7

go "take care [of] this nigga," and left; he had a duffle bag containing an AK-47 rifle and a pistol in his car. When defendant returned a couple of hours later, he told English, "I think I killed that nigga." Defendant explained that the guy crashed his car, and defendant did not believe the guy would have crashed unless he was dying.

At trial, English testified that she lied to police about defendant's involvement in the shooting because she had been upset about seeing him with another woman. She confirmed that she broke up with defendant because she caught him at a casino with another woman. After her interview with police, the FBI gave English $2,000 to relocate from her apartment in Hayward.

### B. The Defense Case

Me'Ya Dean, Swazeere Dean's daughter, testified that she heard gunshots and a car crashing on August 25, and she saw a black Volvo speeding up the street. Investigator Stannard drove three different routes to see how far a person could get in twenty-one seconds from the intersection of 89th Avenue and Olive Street, and then marked his stopping points on a chart for the jury to view.

## II.  DISCUSSION

### A. Pretrial Disclosure under Section 1054.7

Under criminal discovery rules, the prosecution must disclose to the defendant "[r]elevant written or recorded statements of witnesses or reports of the statements of witnesses whom the prosecutor intends to call at the trial." (§ 1054.1, subd. (f).) These disclosures must be made at least thirty days before trial "unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information [to be disclosed] becomes known to, or comes into the possession of, a party within

8

thirty days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred. 'Good cause' is limited to threats or possible danger to the safety of a victim or witness, possible loss or destruction of evidence, or possible compromise of other investigations by law enforcement. [¶] Upon the request of any party, the court may permit a showing of good cause for the denial or regulation of disclosures, or any portion of that showing, to be made in camera. A verbatim record shall be made of any such proceeding." (§ 1054.7.)

Pursuant to section 1054.7, the trial court ordered that defendant, but not his counsel, would be restricted from seeing a summary of Kendrick's statements. Defendant argues that his exclusion and his counsel's exclusion from the in camera hearing to determine the existence of good cause violated his right to counsel and to due process of law under the federal Constitution. He also argues that the trial court abused its discretion in finding good cause for the restricted disclosure based on threats or possible danger to Kendrick and asserts that the prejudice he suffered therefrom requires reversal of the judgment. Defendant's claims lack merit.

### 1. Additional Background

On February 21, 2018 and March 5, 2018, Kendrick made oral, unrecorded, statements to Investigator Basa and the prosecutor, and Investigator Basa later drafted a detailed summary of these statements. On March 13, 2018, the prosecutor filed a section 1054.7 motion seeking to restrict the disclosure of Kendrick's statements to defendant and his counsel, or, alternatively, to preclude disclosure to defendant on the ground that Kendrick's safety was endangered. The prosecutor asked the court to conduct an in camera review of Investigator Basa's report of Kendrick's statements to make its decision.

9

The trial court held an in camera hearing without defendant or his counsel on March 13. Immediately thereafter, the court conducted a hearing in open court with all parties. The court asked if defense counsel was willing to waive defendant's presence for the proceeding, and defense counsel did so. The trial court stated that it had conducted an in camera hearing, and, based on its review of the summary of Kendrick's statements, the prosecutor's declaration supporting the motion, and the prosecutor's comments in camera, the court intended to order the disclosure of the summary of Kendrick's statements with the restriction that defense counsel not reveal its contents to defendant. The trial court stated that this would allow defense counsel to work with his investigator to prepare for trial.

Defense counsel raised a number of objections to the court's intended ruling, arguing that the prosecutor failed to establish a sufficient threat or danger to Kendrick. Defense counsel noted that he was "in the dark" to some extent because he had not read Kendrick's statements. The prosecutor stated that he was not requesting an indefinite restriction, and he intended to concede that defense counsel could speak to defendant about the statements closer to trial. The prosecutor stated that many of the incriminating facts in the case were reflected in other evidence, including the statement of another witness and surveillance video. Additionally, the prosecutor clarified that he had obtained the bulk of the information in the summary of Kendrick's statements from the March 5 interview, his investigator then left the country for five days, and the prosecutor brought the motion as soon as Investigator Basa returned and authored his report. The prosecutor also clarified that he had called defense counsel the week before, told him that he intended to bring the section 1054.7 motion, and told defense counsel that the witness was Kendrick. Defense counsel confirmed that the prosecutor's comments on

10

the timing and substance of the disclosure were accurate, and he had no issue with the notice.

After hearing argument, the trial court stated that it understood that defense counsel was "in the dark to an extent," because he had not reviewed Kendrick's statements. Thus, the trial court invited defense counsel to provide further argument on the issue and check in with the court on Friday, March 16, if he thought it necessary after he read the summary but ruled that disclosure to defendant would be restricted for the time being. The trial court ordered the in camera hearing be sealed and the prosecutor's filing be kept in a confidential envelope in the court file. On March 16, three days before the beginning of jury selection, the trial court lifted its restriction on disclosure.[3]

## 2. Defendant Has Not Established Prejudicial Error

We first address defendant's argument that his exclusion from the in camera hearing violated his constitutional rights to counsel and to due process of law under the federal Constitution. (U.S. Const., 6th & 14th Amends.) " ' "Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citations.] Due process guarantees the right to be present at any 'stage . . . that is critical to [the] outcome' and where the defendant's 'presence would contribute to the fairness of the procedure.' " ' " (*People v. Thompson* (2016) 1 Cal.5th 1043, 1098 (*Thompson*).)

---

[3] In defendant's motion for a new trial, defendant states that the order was lifted two days prior to jury selection. Jury selection began on Monday, March 19, so Friday, March 16 was the last day the court was in session before the March 19 date.

11

Initially, it appears that defendant forfeited his challenge by failing to object and obtain a ruling in the trial court. Defense counsel received prior notice of the March 13 hearing and was present in court that day. The court's minute order reflects that the hearing began at 9:41 a.m. with all counsel present, and counsel conferred with the court in chambers. At 10:26 a.m., the court granted the prosecutor's request and conducted an in camera hearing. After the in camera hearing, at 10:39 a.m., the court went on the record in open court. Defense counsel objected to the court issuing an order restricting disclosure of Kendrick's statements to his client because the prosecutor's declaration did not show that Kendrick was in danger. Defense counsel did not object to the court having conducted the in camera hearing with the prosecutor. Further, the prosecutor stated for the record that, the week before the hearing, he had informed defense counsel that he intended to file a motion under 1054.7 related to Kendrick. Defense counsel again did not object to the ex parte in camera review, and he confirmed that he had no issue with the prosecution's notice. Defendant forfeited his constitutional challenges by failing to object that the in camera hearing should not have been held on an ex parte basis. (*People v. Valdez* (2012) 55 Cal.4th 82, 121–125 (*Valdez*) [defendant appeared to forfeit challenge that he was denied the right to counsel and due process by ex parte in camera hearings under section 1054.7 by failing to raise the issue below].)

In any event, even if defendant preserved the challenge for appeal, reversal would not be warranted. "Contrary to defendant's assertion, even where a court errs in proceeding ex parte, the error is not reversible per se." (*Valdez, supra*, 55 Cal.4th at p. 125.) In *Valdez*, our Supreme Court held that prejudicial error review applies to evaluation of alleged federal constitutional violations resulting from the conduct of ex parte in camera hearings under

12

section 1054.7. (*Id*. at pp. 125–126.) In *Thompson*, our Supreme Court reviewed for prejudicial error a claim that the defendant's constitutional rights to counsel and to due process were violated by the conduct of an ex parte hearing regarding the discovery of letters in a co-defendant's possession, and ultimately found no prejudice. (*Thompson*, *supra*, 1 Cal.5th at p. 1098.)

Likewise, we perceive no prejudice on the record before us. Defense counsel was given a detailed summary of Kendrick's statements on March 13, and he enlisted the assistance of his investigator to interview Kendrick. Although defendant's investigator could not locate Kendrick because Kendrick apparently had no stable residence, defendant does not challenge the timing of the prosecution's initial disclosure of Kendrick's statements in this appeal, and counsel's inability to locate Kendrick did not result from the court's order restricting disclosure of Kendrick's statements to defendant for a few days.

Nor do we perceive reversible error in defense counsel's inability to discuss Kendrick's statements with defendant for a short period of time. On March 16, three days before jury selection, the trial court lifted the order restricting disclosure. Opening statements and the presentation of evidence began on March 27, and Kendrick testified on March 27 and 28, giving defense counsel ample time to discuss Kendrick's statements with defendant. At the March 13 hearing, the trial court informed defense counsel that he could seek to revisit the restricted disclosure order if counsel felt it was necessary once he reviewed the summary of Kendrick's statements. Defendant did not ask for a continuance or raise any further objections to the court's ruling after the prosecution disclosed the summary to him on March 13, indicating that counsel was able to effectively prepare for trial. Indeed,

review of the record shows that defense counsel thoroughly cross-examined Kendrick about his statements and used surveillance video to point out inconsistencies with these statements. There was thus no prejudicial error under state or constitutional standards. (See *Valdez*, *supra*, 55 Cal.4th at p. 128.)

Defendant next argues the trial court abused its discretion in finding good cause to restrict disclosure of Kendrick's statements. Specifically, he claims that the vague, generalized assertions regarding danger to Kendrick in the prosecutor's declaration did not establish good cause. We reject defendant's argument because the trial court's order is presumed correct, and defendant failed to provide an adequate record demonstrating error. (*People v. Garza* (2005) 35 Cal.4th 866, 881 [the trial court's order is presumed correct, and it is appellant's burden to demonstrate error]; *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 13 [rejecting the defendant's sentencing challenge where he failed to provide an adequate record].) The trial court relied on the prosecutor's in camera statements, Investigator Basa's summary of Kendrick's statements, and the prosecutor's declaration in making its good cause ruling. Defendant cites to the public hearing transcript where his counsel discusses some of the prosecutor's declaration, and he augmented the record to include the sealed transcript of the in camera hearing. But the record does not contain Investigator Basa's summary of Kendrick's statements or the prosecutor's declaration. Defendant thus fails to establish error in the court's ruling. In any event, even if we were to assume the court abused its discretion, for the reasons set forth above, the error was harmless under any standard.

## B. Ineffective Assistance of Counsel

Defendant argues that his trial attorney rendered ineffective assistance of counsel by not objecting to the introduction of Milisa English's statement that defendant robbed a Target store. We disagree.

### 1. Additional Background

In her September 10 statement to police, in addition to the information she provided regarding the shooting, English disclosed that defendant robbed a Target store with three others and got away with $60,000. At trial, English reluctantly testified because she understood that she could be arrested if she did not testify. She claimed that she had fabricated everything that she told the police on September 10, including her allegations about the Target robbery, a robbery she saw on the news and thought she could "add on" to make defendant's situation worse. She lied because she wanted defendant to go to jail. The prosecutor asked if English would be considered a snitch if she had been truthful with the police, and she confirmed that was the case. English's statement was played to the jury, including the part about the Target robbery.

After English's statement was played, outside of the jury's presence, the trial court, the prosecutor, and defense counsel discussed her statement with respect to the Target robbery. Defense counsel stated that, with the understanding that the prosecutor was not going to seek to introduce evidence of uncharged crimes, he had not objected to playing this part of English's statement because his strategy was to argue that English had been "reaching for straws" and making up "grandiose" claims. The prosecutor stated for the record that, pursuant to the parties' agreement, he had deleted English's reference to defendant having been in federal prison. He also confirmed that he did not intend to introduce any evidence regarding the

15

Target robbery other than to ask one of the officers who interviewed English "whether he had followed up in identifying the people who Miss English makes reference to."

## 2. Analysis

To establish ineffective assistance, a defendant must show counsel's performance was "deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel, and there is a presumption that counsel's conduct falls within the wide range of reasonable professional assistance. (*Ibid.*)  Courts should not second-guess reasonable, if difficult, tactical decisions in the "harsh light of hindsight." (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 (*Scott*).)  Counsel's decisionmaking must be evaluated in the context of the circumstances at the time. (*Ibid.*)  To establish ineffective assistance, a defendant must also show "resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*Mai,* at p. 1009.)  A reasonable probability is one sufficient to undermine confidence in the outcome. (*Scott*, at pp. 1211–1212.)

Defendant does not satisfy his burden of showing his trial counsel made a tactical decision that fell below an objective standard of reasonableness. English testified that she lied to the police, and the prosecutor began her testimony by introducing evidence that she tried to leave the courthouse that day and had to be handcuffed, she did not want anything to do with the trial, and she had received a threatening message calling her a snitch.  The prosecutor clearly intended to show that English was lying on the stand but had told the truth in her interview, and defense counsel needed to show the

16

opposite. Counsel had reviewed English's statement, and he believed that what it conveyed about the Target robbery would be of use to show that English was not credible in her interview. We are not in a position to second-guess counsel's impressions of how a jury would receive English's statement. Defense counsel also highlighted English's "outlandish tales" to police in his closing argument and emphasized that there was no evidence that defendant robbed Target. He obtained the prosecutor's agreement that he would not present evidence or argue that defendant committed the robbery, and the court instructed the jury that they could only consider English's statements about the robbery to evaluate her credibility. On this record, defense counsel made a reasonable tactical decision that we will not second-guess "in the harsh light of hindsight." (*Scott*, *supra,* 15 Cal.4th at p. 1212.)

Defendant also fails to show prejudice. His prejudice argument depends on the assumption that jurors would have relied on the robbery to conclude that defendant was a person of bad character who therefore committed the murder. The fallacy in this argument is that English's statement provided the only evidence that defendant robbed Target, and, in that same statement, she provided strong evidence that defendant killed Adams. Thus, any credence the jurors placed in the evidence of the robbery depended entirely on their acceptance of the veracity of English's statement. If jurors did not believe English was truthful about what she told police regarding the shooting, it is unlikely they would have believed her statement about the robbery. There was also strong additional evidence of defendant's guilt, including Kendrick's statements to Investigator Basa, the shells and bullet fragments recovered, the surveillance showing the events outside of Guidry's apartment leading to the time of the shooting, Damien Jackson's testimony, and the surveillance video of Jackson and defendant driving down

17

89th Avenue just before the shooting and turning in opposite directions onto Olive Street.  Defendant thus has not shown that it is reasonably probable that English's statements about the robbery improperly led the jury to conclude that defendant was a bad person and therefore committed the charged crimes.

## III.    DISPOSITION

The judgment is affirmed.

BROWN, J.

WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.

*People v. Seales* (A155975)